(No. 59390.—)

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIE E. ENOCH, Appellant.

*Opinion filed February 11, 1988.—Rehearing denied May 31, 1988.*

CUNNINGHAM, J., took no part.
SIMON, J., concurring in part and dissenting in part.

Willie E. Enoch, appellant *pro se*, and Charles M. Schiedel, Deputy Defender, Robert D. Seeder, Assistant Defender, and Theodore A. Gottfried, State Appellate Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Mark L. Rotert and Ellen M. Flaum, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE RYAN delivered the opinion of the court:

The defendant, Willie Enoch, was charged under an indictment with four counts of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)), and one count each of aggravated kidnapping (Ill. Rev. Stat. 1983, ch. 38, par. 10—2), attempted rape (Ill. Rev. Stat. 1983, ch. 38, par. 8—4), and armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2). Following a jury trial in the circuit court of Peoria County, Enoch was acquitted on the charges of armed robbery and murder in the course of armed rob-

bery, but was convicted of all other charges. He waived a jury at the death penalty hearing, and the circuit judge found the defendant eligible for the death penalty on the basis of the two felony-murder convictions: murder in the course of attempted rape and murder in the course of aggravated kidnapping (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)). The judge found no mitigating factor sufficient to preclude imposition of the death penalty, and sentenced the defendant to death. The sentence was stayed pending direct appeal to this court. Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603.

The victim, Armanda Kay Burns, was a 25-year-old housekeeping supervisor employed by the Methodist Medical Center in Peoria. She lived in a basement apartment near the medical center. On April 22, 1983, several members of the housekeeping staff, including the victim, were gathered in the victim's office at the hospital at about 11:30 p.m. All were working the 3 p.m. to 11:45 p.m. shift. Three staff members testified that the defendant entered the office and asked where his brother was. They also saw the defendant speaking with the victim. As two of these witnesses left the hospital at the end of the work shift, they saw the victim and the defendant walking together toward her apartment. One witness testified that he saw them within 100 feet of the victim's dwelling and that she waved at him when he blew his horn.

Derek Proctor testified that the victim had been his girlfriend for about eight months. On April 22, 1983, they had plans to go out with the victim's brother and sister-in-law after the victim finished work. Proctor arrived at the victim's apartment about midnight and rang the doorbell several times. Receiving no response, he waited 5 to 10 minutes and then walked to the hospital, where he asked a security guard to check whether the victim was still there. When told she was not, Proctor

called her apartment from the hospital but got no answer. He then returned to the apartment, rang the doorbell again. Receiving no answer, he walked across the street to buy a pack of cigarettes. He returned to the apartment a few minutes later, rang the doorbell again several times. Getting no response, he sat down on the curb to wait.

A few minutes later, at about 12:45 a.m., he heard the door open. He turned and saw the defendant, wearing a blue pin-striped coat and carrying a white shirt in his hands, coming out. Proctor asked the defendant if the victim was in her apartment and the defendant replied that she was. Proctor rang the doorbell again and, receiving no response, ran after the defendant, whom he saw running across a field near the medical center. Proctor testified that he recognized the defendant as the person who had come to the victim's door the previous night asking to use the telephone while Proctor was watching television.

Proctor returned again to the apartment and knocked on all the windows. He saw that lights were on in the kitchen and bedroom. After looking unsuccessfully for the defendant at several clubs in the area, he went to the home of the victim's brother, and he was accompanied back to the apartment by her brother and sister-in-law, arriving at about 2:15 a.m. They knocked at the door, and receiving no answer, kicked in the basement window. They saw the apartment in disarray and the victim's body on the bedroom floor. A hospital security guard and the Peoria police who were summoned testified that they observed the victim with her hands bound behind her back with wire, a laceration across her throat, numerous stab wounds in her chest, and a cut from her sternum to her pubic bone. An autopsy revealed that the cause of death was a stab wound in the victim's back.

Louise Pate, the defendant's girlfriend, testified that in the early morning of April 23, 1983, the defendant returned to their apartment, went into the bathroom and turned on the water. He then left the apartment to get some cigarettes. When he returned he told her that he had killed Kay Burns that night. He said that he had "cut her throat and heart out," and that on the way out of her apartment he had bumped into the victim's boyfriend. The defendant told Pate that he had just burned the pants he had been wearing in an incinerator outside.

After the trial had started, defendant moved to suppress statements he had made following his arrest. Detective Charles Cannon testified at a suppression hearing that, after he arrested the defendant at Pate's apartment, the defendant was taken to the Peoria police department, where he was interviewed by Detective Sammie Hoskins and himself. While he was being read his *Miranda* rights, the defendant requested an attorney. Detective Cannon continued reading the *Miranda* warnings and, when he finished, asked whether the defendant understood his rights. The defendant said he did and he still wanted an attorney. Detective Cannon told defendant that no more questions would be asked and that he would explain the procedure for obtaining an attorney. He then told the defendant that he would be taken to the county jail and booked for murder. The defendant asked whose murder he was being charged with and the officer told him the murder of Kay Burns. The defendant replied, "Oh no, not Kay Burns," and told the officers he had seen her at the hospital the night before, had walked with her to within a block of her apartment, and had then gone home. The officer then told defendant that a witness had seen him leaving her apartment, and again stated that no questions would be asked of defendant. The circuit court found that the defendant's statements were voluntary utterances, and not the result of

questioning or its functional equivalent. The court therefore denied the defendant's motion to suppress the statements, and Officer Hoskins testified to the statements at trial.

Following the suppression hearing, the State made an offer of proof, asking that evidence of other crimes unrelated to the murder of Kay Burns be admitted to show that the defendant had the "intent and design" to commit rape against the victim. Over defense objections, the court admitted evidence concerning two prior incidents. As to the first, Louella Burnside testified that on March 6, 1983, the defendant raped her. She said that having locked herself out of her apartment at about 4 a.m., she was walking in her neighborhood looking for her husband, who had her keys, when she met the defendant. He pulled a knife, stabbed her in the back, pulled her into a garage, threatened to cut her throat, told her to remove her clothes, and then raped her. After raping her, he told her he would tie her hands behind her back loosely so that she could escape after a few minutes. He then ripped her jacket and used it to tie her hands and gag her. After the defendant left, she escaped and called the police. She identified an army fatigue jacket recovered in Pate's apartment as the one defendant was wearing on the night of the incident.

Marilyn McClain testified to a second incident in which the defendant knocked at her door and asked where his brother lived. When she said she did not know, he asked for a glass of water. As she returned the glass to the kitchen, the defendant entered the apartment and locked the door. He approached her with a pocket knife and cut her stomach, placed her on the couch and tied her hands behind her back and gagged her with a towel he had ripped up. He asked if there was any money in the apartment and whether she "had her period." While he was searching the apartment, she got

her hands free and ran to the door, calling for help from her neighbor. The neighbor testified that, hearing McClain's screams, she looked out of her apartment and saw the defendant running down the stairs.

The defendant did not take the stand. The defense presented testimony that the defendant was wearing a different shirt from the one he was alleged to have worn on the night of the incident; that Proctor, the victim's boyfriend, had told a hospital security guard at about 12:10 a.m. on the night of the incident that there was a window broken at the victim's apartment and that he had seen a man leaving her apartment; and that Pate, the defendant's girlfriend, had told the defendant's mother that she wanted to change her grand jury testimony implicating the defendant and had contacted a person for legal advice regarding the penalty for perjury. The jury found the defendant guilty of murder, aggravated kidnapping, and attempted rape, and of two counts of felony murder based on the aggravated kidnapping and attempted rape charges.

Defendant raises numerous issues before this court, including that his kidnapping conviction was improper because the same act which comprised the aggravated kidnapping was also one of the two acts which comprised the attempted rape; that the prosecutor's opening argument was improper; that defendant did not knowingly and intelligently waive his right to a jury sentencing; and that the trial court erred by erroneously admitting evidence of a prior rape and a prior attempted rape, by excluding a paragraph of the pattern jury instructions, by allowing a police detective to assist the State in selecting the jury, and by finding that the defendant presents a clear and present danger in prison.

Since defendant failed to file a post-trial motion as required by the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 116—1), the State argues

that these issues have been waived. We have often stated the general rule that the failure to raise an issue in a written motion for a new trial results in a waiver of that issue on appeal. (*People v. Shum* (1987), 117 Ill. 2d 317; *People v. Szabo* (1986), 113 Ill. 2d 83, 93; *People v. Porter* (1986), 111 Ill. 2d 386, 399; *People v. Caballero* (1984), 102 Ill. 2d 23, 31.) We stated the reasons for the waiver rule in *Caballero*:

> "Failure to raise issues in the trial court denies that court the opportunity to grant a new trial, if warranted. This casts a needless burden of preparing and processing appeals upon appellate counsel for the defense, the prosecution, and upon the court of review. Without a post-trial motion limiting the consideration to errors considered significant, the appeal is open-ended. Appellate counsel may comb the record for every semblance of error and raise issues on appeal whether or not trial counsel considered them of any importance." 102 Ill. 2d 23, 31-32.

The dissent (122 Ill. 2d at 204-06 (Simon, J., dissenting)) insists, as defense counsel often do, that it is not necessary, in order to preserve a question for review, that there be both an objection to the evidence at trial and a written post-trial motion raising the question of the objected-to evidence. The dissent argues that it is sufficient if the issue is raised *either* during trial *or* in a post-trial motion. This is not the law in this State. *Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial. The dissent cites *People v. Black* (1972), 52 Ill. 2d 544, 551, and *People v. Needham* (1961), 22 Ill. 2d 258, 259, as holding that the absence of both a trial objection and a post-trial motion constitutes waiver. This assertion simply inverts the holdings of those cases, which is that the presence of both a trial objection and a written post-trial motion raising the issue are necessary to preserve an issue for review. This court

stated in *People v. Carlson* (1980), 79 Ill. 2d 564, 577, and *People v. Roberts* (1979), 75 Ill. 2d 1, 11, the reason for the waiver rule when no objection to the alleged error was made during trial.

The requirement that the alleged error be included in a post-trial motion has a different basis from the requirement that an objection be made at trial. The requirement for a written post-trial motion is statutory, and the statute requires that a written motion for a new trial *shall* be filed by the defendant and that the motion for a new trial *shall* specify the grounds therefor. (Ill. Rev. Stat. 1983, ch. 38, par. 116—1.) A written motion for a new trial may include not only alleged trial errors and errors in instructions that have been properly preserved by timely objection, but also other grounds for a new trial such as newly discovered evidence. Failure to specify grounds for a new trial in writing in a motion for a new trial has been held by this court to constitute waiver of the issue on the review in the absence of plain error. (*People v. Pickett* (1973), 54 Ill. 2d 280.) Simply because an objection to evidence may have been made during the trial does not justify ignoring the clear mandate of the statute that the question be set forth in writing in the motion for a new trial.

The dissent has read section 116—1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 116—1) as not requiring the filing of a written motion for a new trial. The dissent contends that this section of the Code "merely mandates the timing and the contents of a motion for those who choose to file a motion for a new trial." (122 Ill. 2d at 207 (Simon, J., dissenting).) This is a strained construction of the statute. There is no authority supporting this position. Prior to 1963, a motion for a new trial was not required when the trial was before the court and not a jury, but the language of section 116—1 has changed the law in that re-

spect and a written motion for a new trial is now required in both jury and nonjury cases. See Leighton, *Post-Conviction Remedies in Illinois Criminal Procedure*, 1966 U. Ill. L.F. 540.

It has been held that the requirement of a written motion can be waived if a defendant makes an oral motion for a new trial and the State does not object. The defendant may then avail himself of any ground for a new trial which might appear in the record. This apparent circumvention of the requirement that the motion for a new trial be in writing and specify the grounds is based on the concept of waiver. Since the State failed to object to the oral motion, it has waived the requirements of the statute. (*People v. Flynn* (1956), 8 Ill. 2d 116, 118-20.) However, when no motion for a new trial is made, the first opportunity that the State has to object to the defendant's failure to comply with the statute is when the defendant raises issues on appeal.

In *People v. Irwin* (1965), 32 Ill. 2d 441, the defendant had not raised in his motion for a new trial any of the questions raised on review. This court held all of those questions were waived. The court noted that requiring the defendant to specify alleged errors in a motion for a new trial may save the delay and expense inherent in an appeal. The requirement also focuses the attention of the trial judge upon those aspects of the proceedings of which the defendant complains. The court concluded: "In short, we believe this waiver rule a salutary one serving a legitimate State interest in that it tends to eliminate unnecessary reviews and reversals." *People v. Irwin*, 32 Ill. 2d at 444.

The dissent further contends that our construction of section 116—1 conflicts with our Rule 366. There is no such conflict. Rule 366 relates to civil appeals. Rule 612 lists the civil appeal rules which apply to criminal appeals. Rule 365 and Rule 367 are listed as applying to

criminal appeals. However, Rule 366 is not. The dissent points out that in *People v. Lilly* (1974), 56 Ill. 2d 493, *People v. Murrell* (1975), 60 Ill. 2d 287, and *People v. Scott* (1977), 69 Ill. 2d 85, this court applied Rule 366 to criminal appeals.

The above three criminal cases, which applied Rule 366, all were concerned with the power of a reviewing court and entered orders under Rule 366(a). The powers enumerated in Rule 366(a) for civil appeals are similar to those set out in Rule 615(b), which pertains to criminal appeals. In fact, in *People v. Scott*, this court noted that in *People v. Lilly*, Rule 366 was applied in vacating an incomplete judgment in a criminal case, and in *Scott*, we followed *Lilly*. However, we also stated in *Scott* that the authority for such an order as was entered could also be found under Rule 615(b).

Rule 366(b), which the dissent would have us apply in this case, relates to the scope of review in civil cases. The dissent has cited no case in which Rule 366(b) has been applied to a criminal appeal. The counterpart in criminal cases to the provisions of Rule 366(b), which pertains to the scope of review in civil cases, is found in Rule 615(a). That rule provides that any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court. (87 Ill. 2d R. 615(a).) Thus, under Rule 615(a), the only time, in a criminal appeal, that a court of review may apply the broad scope of review pertaining to civil appeals found in Rule 366(b)(3)(ii), as the dissent would have us do (neither the filing of, nor the failure to file a post-trial motion, limits the scope of review), is when plain error is involved. This is in accord with the holding of this opinion wherein, as we set out below, plain error is one of

the three exceptions to the waiver rule in criminal cases where no motion for a new trial has been filed.

Our constitution requires that this court review all cases in which a sentence of death is imposed. (Ill. Const. 1970, art. VI, §4(b).) However, our constitutional obligation to review death penalty cases does not require us to review every issue raised on appeal when the issues are not properly preserved by an objection in the trial court and a written post-trial motion. In *Porter* and *Caballero* this court noted that although death penalty cases are required by our constitution to be reviewed by this court, trial counsel nonetheless has an obligation to see that the statute requiring a post-trial motion is complied with so that the review will be limited to issues of some significance. Although we have not heretofore defined the limits of such a review, we now hold that when the defendant fails to comply with the statutory requirement to file a post-trial motion, our review will be limited to constitutional issues which have properly been raised at trial and which can be raised later in a postconviction hearing petition (Ill. Rev. Stat. 1983, ch. 38, par. 122—1), sufficiency of the evidence, and plain error. By limiting our review in cases where no post-trial motion is filed, we will promote judicial economy and finality of judgments. We will, at the same time, be protecting the integrity of the judicial system and the rights of criminal defendants.

The dissent characterizes our defining of the extent of our review of capital cases in the absence of a written motion for a new trial as "new" and "unprecedented" and as having been without warning. Quite to the contrary, the procedure we outline is in fact an expansion of the right of review previously allowed by this court when no written post-trial motion has been filed. As stated in *People v. Pickett* (1973), 54 Ill. 2d 280, such a failure has, in the past, constituted waiver, except in cases in-

volving plain error. The dissent relies upon *People v. Porter* (1986), 111 Ill. 2d 386, and *People v. Caballero* (1984), 102 Ill. 2d 23, as "at least implicitly recognizing that [the court's] constitutional duty to review capital cases was of greater import than the waiver doctrine." (122 Ill. 2d at 205 (Simon, J., dissenting).) In *Caballero* (a capital case), no post-trial motion was filed, and the court did not deny review because of a constitutional provision for automatic review by this court in death penalty cases. (Ill. Const. 1970, art. VI, §4(b).) However, this court stated that regardless of our duty to review such cases, trial counsel has the obligation to comply with the statutory requirements with regard to written post-trial motions, and indicated that review should be limited to issues of some significance. Clearly, *Caballero* cannot be viewed as giving an assurance to convicted defendants of the right of unlimited review in all capital cases, when no post-trial motion has been filed. Rather, it should be viewed as a warning that post-trial motions should be filed in such cases and that review should be limited to "issues of some significance."

*People v. Porter*, which was also cited by the dissent, is not in point, because in that case a post-trial motion was filed. The motion raised the general issue of whether the defendant was denied a fair trial by an impartial jury, and referred to the presence on the jury of a woman who attended the same church as the mother of the victim but did not question the adequacy of the *voir dire* examination of the jury. In *Porter*, this court again warned that in spite of its constitutional duty to review capital cases, trial counsel continues to have the obligation to comply with the statutory provisions governing motions for a new trial. In view of the warnings of *Caballero* and *Porter* and the previous holding of *People v. Pickett*, it cannot be said that the limits of review in capital cases, announced in this case, where no post-trial

motion is filed, is "without warning" or is "new and unprecedented," as characterized in the dissent.

Turning now to the issues that fall within these categories, defendant argues that the admission into evidence of statements he made to the police officer after he requested an attorney violated his fifth amendment privilege against self-incrimination. The State responds that defendant's statements were properly admitted because they were voluntary utterances and not the result of interrogation.

It is undisputed that during the reading of his *Miranda* rights and again afterwards, defendant requested an attorney. After reading all of the *Miranda* warnings, the interrogating officer told defendant that he would explain the procedure for obtaining an attorney.

It is not clear from the record the sequence in which the various statements were made by the officer and by the defendant. The officer testified that at the conclusion of the *Miranda* warnings the defendant stated he still wanted an attorney. In explaining the procedure for getting an attorney, the officer told the defendant that he would be taken to the Peoria County jail and booked for murder. The defendant then asked whose murder and the officer told him the murder of Kay Burns. The officer testified that the defendant then stated, "Oh no, not Kay Burns," and proceeded to tell the officer that he, the defendant, saw her the prior evening and had walked to within about a block of her home with her. The officer stated he again said that he was not asking any more questions but that they had a witness who saw the defendant leaving the victim's apartment. This sequence as to the statements was repeated by the officer on cross-examination. However, from the testimony given by another officer, one may conclude that the defendant was told he was going to be booked for the

murder of Kay Burns, and that they had a witness who had seen him leaving her apartment, before the defendant stated, "Oh no, not Kay Burns." The defendant relies on this latter sequence of statements, contending that telling the defendant that the State had a witness who had seen him leaving the victim's apartment was the functional equivalent of interrogation and prompted the defendant to say, "Oh no, not Kay Burns." The defendant did not testify at the suppression hearing. Following counsel's arguments at the suppression hearing, the trial court concluded that neither *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, nor *Rhode Island v. Innis* (1980), 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682, preclude police from informing a defendant of the crime for which he was arrested and the reason for the arrest. The trial court did not discuss the difference in the evidence concerning the sequence of the statements but found that the defendant's statements were voluntary utterances and not the result of police interrogation or its functional equivalent. The motion to suppress was denied, and at trial an officer testified regarding the defendant's statements.

Under *Miranda* and its progeny, once an individual states that he wants an attorney, all interrogation must cease until an attorney is present. (*Miranda v. Arizona* (1966), 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627.) "Interrogation" is defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308, 100 S. Ct. 1682, 1689-90.) In the present case, informing the defendant that he was being booked for the murder of Kay Burns was clearly a police action "normally attendant to arrest and custody."

We find that the trial court's holding that the defendant's statements were voluntary utterances and not the product of police interrogation or its functional equivalent is supported by the evidence. The trial court, following argument of counsel at the suppression hearing, specifically referred to *Rhode Island v. Innis* and applied the "interrogation or its functional equivalent" test of that case. After reviewing the evidence at the suppression hearing in light of the *Innis* test, the court concluded that the defendant's statements were voluntary utterances and not the product of police interrogation. We find that the holding of the trial court was not contrary to the manifest weight of the evidence. We will not therefore set aside the determination made by the fact finder. See *People v. Dalton* (1982), 91 Ill. 2d 22, 31.

It is not clear exactly what statements that were made by the defendant he seeks to suppress. The only specific utterances by the defendant made to the officer and argued at the suppression hearing and here were "Oh no, not Kay Burns" and the statement by the defendant that he had walked with her to within a short distance of her home. Regardless of the source of these utterances, the error in their admission, if any, must be considered to be harmless beyond a reasonable doubt. As shown by the evidence detailed elsewhere in this opinion, there is other evidence which establishes beyond a reasonable doubt that the defendant killed Kay Burns and that he was walking with her within a block of her home on the night of the murder.

The defendant also argues that his conviction for aggravated kidnapping (Ill. Rev. Stat. 1983, ch. 38, par. 10—2) was not supported by sufficient evidence. Kidnaping occurs when a person knowingly and secretly confines another against his will. (Ill. Rev. Stat. 1983, ch. 38, par. 10—1.) A kidnapper commits the offense of aggravated kidnapping when he inflicts great bodily harm

or commits another felony upon his victim in the course of the kidnapping. (Ill. Rev. Stat. 1983, ch. 38, par. 10—2(a)(3).) Defendant argues that the elements of secrecy and confinement or restraint were not established by the evidence.

Defendant's position with regard to the secrecy element is that since witnesses saw him go to the victim's apartment with her, and since he made no overt attempt to conceal the victim's location from anyone, there could be no secret confinement. This argument reflects a misunderstanding of the nature of the secret confinement required by our kidnapping statute. The secret confinement element of kidnapping may be shown by proof of the secrecy of either the confinement or the place of confinement. (*People v. Mulcahey* (1978), 72 Ill. 2d 282, 285; *People v. Kleba* (1982), 110 Ill. App. 3d 345, 357.) In the case before us, the evidence clearly supports the conclusion that the victim's confinement was secret. The victim was secretly confined as effectively in her own home as if defendant had transported her to some remote isolated place of confinement. (*People v. Mulcahey* (1978), 72 Ill. 2d 282, 285.) Moreover, there was sufficient evidence to support the conclusion that the place of confinement was also secret. Although two witnesses saw the defendant and the victim walking toward her apartment, no one actually knew that they were in the apartment.

From the evidence previously detailed in this opinion, it appears that the victim's boyfriend, Derek Proctor, tried for a period of at least 45 minutes to ascertain if the victim was in her apartment. He rang the doorbell several times. He then went to the hospital to see if she had left work. He called her apartment from the hospital. He returned to the apartment and again rang the doorbell several times. After going across the street to purchase some cigarettes, he returned to the apartment and again rang the doorbell. It is evident that at all

times the defendant and the victim were in the apartment and that the defendant made no response to the call or the ringing of the doorbell and permitted none. It was not until Proctor saw the defendant leaving the apartment building and asked him if the victim was in her apartment that the fact that she was there became known. In addition, although the victim's boyfriend expected to meet her at her apartment that night, when the victim did not respond to the doorbell her boyfriend thought that she might still be at work. We conclude that the evidence establishes that the victim was secretly confined.

Defendant next contends that there was insufficient evidence to prove that the victim was restrained by him in her apartment. We disagree. In addition to the evidence that the victim's hands were bound during the attack, there was also evidence that the victim's blood was found in several rooms in the apartment and on the telephone, which supports the conclusion that the victim attempted to escape from the defendant and that she was prevented from doing so.

The dissent discusses at length the defendant's conviction of aggravated kidnapping and concludes "[t]hat the method by which murder was committed in this case required momentary confinement cannot, in my opinion, supply the basis for an aggravated kidnapping conviction." (122 Ill. 2d at 220 (Simon, J., dissenting).) Of course, it was never argued in the defendant's brief that the "momentary confinement" associated with the victim's murder could not form the basis for the aggravated kidnapping charge, nor was it argued that the asportation or confinement was incidental to or inherent in the substantive crime of murder. The defendant argued in this court that the victim's restraint or detention made up a significant portion of the attempted rape offense, not the murder. The defendant further argued

that he should not have been convicted of both attempted rape and aggravated kidnapping.

The evidence which we have outlined herein justified submitting the question of the defendant's guilt as to both crimes (aggravated kidnapping and attempted rape) to the jury, and supports the finding of guilt as to both offenses.

We do not argue with the logic of the dissent's contention that an aggravated kidnapping conviction should not be sustained where the asportation or confinement may constitute only a technical compliance with the statutory definition but is, in reality, incidental to another offense. We can decide that issue when the proper factual pattern is presented. However, this is not such a case. It cannot be seriously argued that in every case where a victim is murdered or raped during a secret confinement the perpetrator is to be absolved of guilt as to the offense of kidnapping. The evidence detailed herein supports the conclusion that there was more than a simple detainment incidental to the murder or rape. This was a secret confinement which constituted kidnapping within the statutory definition (Ill. Rev. Stat. 1983, ch. 38, par. 10–1), and every attempt by the victim's boyfriend to contact her was thwarted.

The defendant next argues that his conviction for attempted rape was not supported by sufficient evidence, because the evidence did not prove beyond a reasonable doubt that defendant had specific intent to commit rape. In order to sustain a conviction on the charge of attempted rape, proof of the specific intent to commit rape is essential. (*People v. Beason* (1975), 32 Ill. App. 3d 305, 307.) However, the requisite intent may be inferred from the circumstances of the assault. *People v. Triplett* (1970), 46 Ill. 2d 109, 112; *People v. Williams* (1984), 128 Ill. App. 3d 384, 396.

We conclude that the evidence presented was sufficient to support the finding of intent to commit rape. The evidence showed that the victim was disrobed from her waist down, that her hands were tied, and that her blouse and jacket were pulled down around her arms. In addition, there was evidence that the victim had been gagged. Evidence of an assault with concomitant disrobing of the victim is sufficient to support a conviction for attempted rape. *People v. Bonner* (1967), 37 Ill. 2d 553, 562; *People v. Williams* (1984), 128 Ill. App. 3d 384, 396-97.

The dissent discusses at length evidence of other crimes which was admitted at trial in connection with the charge of attempted rape. These alleged trial errors have not been discussed in this opinion because they have been waived by the failure to raise them in the post-trial motion. The admissions of this evidence did not constitute plain error, because, as noted above, there was sufficient evidence, in addition to the now complained-of evidence, to support the finding of intent to commit rape and the conviction for attempted rape. This other evidence of the defendant's intent to commit rape is not equivocal, as the dissent characterizes it. Such a characterization is rebutted by the evidence recited in the paragraph above. Also, as to the defendant's conviction for attempted rape, we need not find McClain's testimony concerning a prior offense to be harmless error, as the dissent urges. Rather, since this question was not preserved in a post-trial motion, before the propriety of the admission of McClain's testimony can be considered on review, it must have constituted plain error. As noted above, it did not.

We need not consider alleged trial errors that were waived by the failure of the defendant to raise the issues at trial and to preserve them in a post-trial motion in light of the plain error doctrine. The evidence of defend-

ant's guilt was overwhelming. We noted in *People v. Carlson* (1980), 79 Ill. 2d 564, 576:

> "A significant purpose of the plain error exception to the waiver doctrine is to correct any serious injustices which have been done to the defendant. It therefore becomes relevant to examine the strength or weakness of the evidence against him; if the evidence is close, there is a possibility that an innocent person may have been convicted due to some error which is obvious from the record, but not properly preserved. Thus, this court has held that where the evidence is closely balanced, a court of review may consider errors that have not been properly preserved for review. *People v. Howell* (1975), 60 Ill. 2d 117, 121; *People v. Pickett* (1973), 54 Ill. 2d 280, 283."

Justice does not require the application of the plain error doctrine under the facts of this case.

The same rationale applies to the defendant's argument that the court should have *sua sponte* given an instruction on the aggravated kidnapping lesser included offense of unlawful restraint. Defendant tendered no instruction on unlawful restraint. The general rule is that the court is under no obligation to give instructions not tendered. See *People v. Gaines* (1981), 88 Ill. 2d 342, 366-67; *People v. Carlson* (1980), 79 Ill. 2d 564, 583-84.

The defendant relies on *Beck v. Alabama* (1980), 447 U.S. 625, 65 L. Ed. 2d 392, 100 S. Ct. 2382, which held that the sentence of death could not be imposed after a jury verdict of guilty of a capital offense when the jury was not permitted to consider a verdict of guilty of a lesser included noncapital offense, provided that the evidence would support such a verdict. The Supreme Court, in *Hopper v. Evans* (1982), 456 U.S. 605, 72 L. Ed. 2d 367, 102 S. Ct. 2049, explained its holding in *Beck* by saying:

> "Our holding in Beck, like our other Eighth Amendment decisions in the past decade, was concerned with insuring that sentencing discretion in capital cases is chan-

nelled so that arbitrary and capricious results are avoided." (*Hopper v. Evans* (1982), 456 U.S. 605, 611, 72 L. Ed. 2d 367, 373, 102 S. Ct. 2049, 2052.)

The Court in *Hopper*, relying on *Roberts v. Louisiana* (1976), 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001, concluded that an instruction on a lesser included offense is impermissible absent evidence supporting a conviction of the lesser included offense. (456 U.S. 605, 611, 72 L. Ed. 2d 367, 373, 102 S. Ct. 2049, 2052.) The Court then noted that *Beck* held that due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction. However, the Court further stated:

"But due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction. The jury's discretion is thus channelled so that it may convict a defendant of any crime fairly supported by the evidence." (Emphasis in original.) *Hopper v. Evans* (1982), 456 U.S. 605, 611, 72 L. Ed. 2d 367, 373, 102 S. Ct. 2049, 2053.

Under our statute, kidnapping requires a *secret confinement* of a person against his will. (Ill. Rev. Stat. 1983, ch. 38, par. 10—1.) Unlawful restraint requires only that a person knowingly, without legal authority, *detains* another. (Ill. Rev. Stat. 1983, ch. 38, par. 10—3.) Aggravated kidnapping is committed when a kidnapper inflicts great bodily harm upon the victim or commits the offense of kidnapping while armed with a weapon. (Ill. Rev. Stat. 1983, ch. 38, pars. 10—2(3), (5).) Thus, one major distinction between kidnapping and unlawful restraint is that kidnapping involves a secret confinement, whereas unlawful restraint involves merely detaining another without legal authority. There is just no evidence in this case that could support the finding that the defendant merely detained the victim. Her wrists were bound with wire, the defendant did not respond to the

telephone call or to the many ringings of the doorbell, and the trail of blood disclosed that the victim went from room to room while she was severely wounded. This secret confinement was aggravated by the fact that the defendant was armed with a knife and that he inflicted great bodily harm on the victim by stabbing her, cutting her throat, and opening her abdomen from her sternum to her pubic bone. Referring again to the Supreme Court's decision in *Hopper*, the Court there noted that under the Federal ruling, a lesser included offense instruction should be given only if the evidence would permit a jury rationally to find a defendant guilty of the lesser offense and acquit him of the greater. (*Hopper v. Evans* (1982), 456 U.S. 605, 612, 72 L. Ed. 2d 367, 373, 102 S. Ct. 2049, 2053.) Under the evidence in this case the jury could not have rationally convicted the defendant of unlawful restraint and could not have rationally acquitted him of aggravated kidnapping. The trial court did not err in failing to *sua sponte* instruct the jury on the offense of unlawful restraint.

The defendant argues that the failure of his trial counsel to file a post-trial motion and his failure to preserve trial error for review constituted ineffective assistance of counsel. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, outlined a two-part test of ineffective assistance of counsel. The defendant must first show that his counsel's performance fell below an objective standard of reasonableness. However, counsel's performance of failing to meet the first aspect of this test will not be found to constitute ineffective assistance under the Constitution unless it is shown to be prejudicial to the defendant. (See *People v. Gaines* (1984), 105 Ill. 2d 79, 92-93.) This court noted in *Gaines* that *Strickland* recognized that a court need not decide the performance component of an ineffective assistance of counsel claim before analyzing the prejudice

component. (105 Ill. 2d 79, 92-93.) In *Gaines*, this court concluded that the challenged conduct of counsel, even if found to be unreasonable, was insufficient to show that there was a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. (105 Ill. 2d 79, 93-94.) In support of this conclusion, the *Gaines* court went on to note that the evidence of defendant's guilt and the aggravating circumstances was overwhelming. (105 Ill. 2d 79, 93-94.) In *People v. Albanese* (1984), 104 Ill. 2d 504, relying on *Strickland*, this court noted that the benchmark for judging a claim of ineffectiveness must be whether counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied upon as having produced a just result.

This court, in determining claims of ineffective assistance of counsel since *Strickland*, has considered the claims in light of the strength of the evidence against the defendant and the possible prejudicial effect of the alleged defective representation. We have held generally that the defendant must show actual prejudice, and unless there is a reasonable possibility that but for counsel's errors the result would have been different, a new trial will not be granted. *People v. Guest* (1986), 115 Ill. 2d 72, 88-89; *People v. Free* (1986), 112 Ill. 2d 154, 169; *People v. Weir* (1986), 111 Ill. 2d 334, 338-39; *People v. Albanese* (1984), 104 Ill. 2d 504, 525-27.

In view of the overwhelming evidence of the defendant's guilt, and of the aggravating circumstances, it cannot be reasonably contended that the results would possibly have been different but for the alleged substandard representation by counsel.

The defendant next raises a battery of constitutional challenges to Illinois' death penalty statute which have previously been considered and rejected. This court has held that the statute does not arbitrarily limit imposition

of the death penalty to only those defendants who do not require special assistance in order to be fit for trial. (*People v. Hall* (1986), 114 Ill. 2d 376, 420; *People v. Stewart* (1984), 104 Ill. 2d 463, 499-502.) Likewise, we have stated that the statute adequately ensures that aggravating factors relied upon be relevant or constitutionally permissible (*People v. Albanese* (1984), 104 Ill. 2d 504, 541), that the absence of mitigating factors need not be proved beyond a reasonable doubt (104 Ill. 2d 504, 541-42), that the sentencer need not find that the death penalty is "appropriate" (104 Ill. 2d 504, 536-38), and that the statute provides for adequate appellate review (104 Ill. 2d 504, 541). We continue to adhere to our previously stated positions on these issues.

The judgments of convictions and the sentences imposed by the circuit court of Peoria County are affirmed. The clerk of this court is directed to enter an order fixing Thursday, May 12, 1988, as the date on which the sentence of death entered in the circuit court is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be furnished by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgments affirmed.*

JUSTICE CUNNINGHAM took no part in the consideration or decision of this case.

JUSTICE SIMON, concurring in part and dissenting in part:

With but one reservation, I concur in the court's decision to affirm the defendant's murder conviction. The

question of whether the police officer's conduct constituted the "functional equivalent" of interrogation within the meaning of *Rhode Island v. Innis* (1980), 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682, cannot be left to the fact finder, as the majority suggests. Whether the circumstances as found by the fact finder constitute interrogation is a legal question, and the majority appears to have abdicated its judicial responsibility for deciding that issue of law. But in light of the substantial evidence of the defendant's culpability, any error in admitting the statement at issue ("Oh no, not Kay Burns") must be deemed harmless beyond a reasonable doubt.

However, because I have strong convictions that imposition of the death penalty is improper in this case, I dissent. I believe that the majority's adoption of a new waiver rule both unfairly punishes this defendant and impermissibly narrows this court's constitutional obligation to review all capital cases. Furthermore, as I understand them, the consequences that the majority attaches to the defendant's failure to file a post-trial motion are inconsistent with the court's previously stated position in *People v. Caballero* (1984), 102 Ill. 2d 23, and *People v. Porter* (1986), 111 Ill. 2d 386.

> "[In] a death penalty case, which under our constitution is automatically reviewed by this court (Ill. Const. 1970, art. VI, sec. 4(b)), we must review the case whether or not a written motion for a new trial has been filed. Otherwise, the constitutional provision for an automatic appeal would be meaningless." *People v. Caballero* (1984), 102 Ill. 2d 23, 32.

In *Caballero*, the court attempted to circumscribe this constitutional obligation by suggesting that review was limited to "issues of some significance," which trial lawyers *should* identify in a post-trial motion. (*People v. Caballero* (1984), 102 Ill. 2d 23, 32-33.) In *Porter*, the court similarly admonished trial counsel to comply with the

post-trial motion statute. (*People v. Porter* (1986), 111 Ill. 2d 386, 399.) But in both cases, after admonishing counsel, this court proceeded to decide issues that had not been preserved in a post-trial motion, thereby at least implicitly recognizing that its constitutional duty to review capital cases was of greater import than the waiver doctrine or trial counsel's statutory obligation to file post-trial motions. This recognition is consistent with my previous observation that "few propositions have a longer pedigree in the common law of this State than that any irregularity not *expressly* waived in the trial of a capital case must be heard on review. (*Nomaque v. People* (1825), 1 Ill. (1 Breese) 145, 149; see *People v. Fisher* (1930), 340 Ill. 216, 259.)" (Emphasis in original.) *People v. Free* (1983), 94 Ill. 2d 378, 435 (Simon, J., concurring in part and dissenting in part).

Here, without warning, the court has adopted a retroactive change in the rules of criminal procedure requiring defendant to have filed a post-trial motion in order to raise significant issues that do not fall within the court's new—and unprecedented—three-way exception for certain constitutional issues, sufficiency of the evidence and plain error. (122 Ill. 2d at 190.) It strikes me as fundamentally unfair for the court to impose sanctions for the failure to file a motion in a case where the defendant did not and could not have known of the court's new sanctions at the time the motion was to have been filed. What value there is in imposing sanctions in these circumstances eludes me, but whatever it may be, it cannot be a value greater than that of the defendant's life.

Application of the court's new waiver rule is especially troublesome in light of the Supreme Court's recognition that "the penalty of death is qualitatively different from a sentence of imprisonment, however long." (*Woodson v. North Carolina* (1976), 428 U.S. 280, 305,

49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.) As Justice Clark has noted, "[b]ecause the United States Supreme Court has stated that a sentence of death is qualitatively different, I believe these cases should be treated differently under the waiver rule." (*People v. Szabo* (1986), 113 Ill. 2d 83, 99 (Clark, C.J., dissenting).) Thus, I fail to understand, particularly in view of the special constitutional provision for direct appeal to this court, why a meritorious claim should be lost on appeal in a capital case simply because defense counsel failed to file a posttrial motion.

I dissent not only from the application of the court's new rule in this case, but to the new rule itself. Generally, the absence of a proper objection or motion at trial *and* the omission of the issue from a written motion for a new trial constitutes a waiver of that issue on appeal. (*People v. Black* (1972), 52 Ill. 2d 544, 551; *People v. Needham* (1961), 22 Ill. 2d 258, 259.) As the majority notes by quoting *Caballero*, the purposes of this waiver rule are straightforward. (122 Ill. 2d at 186, quoting *People v. Caballero* (1984), 102 Ill. 2d 23, 31-32.) Requiring a defendant to identify alleged errors to the trial court enables that court to consider and correct its own errors and thereby eliminates the need for an appeal with its attendant delay and expense. This procedure also "gives to the reviewing court the benefit of the judgment and observations of the trial court" regarding the alleged errors. (*People v. Irwin* (1965), 32 Ill. 2d 441, 443-44.) That rationale for the waiver rule is satisfied if an issue is properly presented either during trial or in the posttrial motion except where a contemporaneous objection is required.

In this case, the defendant raises a question regarding the admission of evidence of prior offenses; an objection was made and the issue was fully argued in the trial court. The observations and explanations of the circuit

judge are explained in the transcript of the trial. Even though the goals of the waiver rule have been satisfied, this court states that it need not consider the issues raised on appeal because no post-trial motion was filed. Instead, the majority asserts that there is a separate rationale for applying the waiver doctrine in cases where the alleged error was brought to the attention of the trial court, but was not included in a post-trial motion. Relying on the post-trial motion statute (Ill. Rev. Stat. 1983, ch. 38, par. 116—1), which requires defendants who choose to file post-trial motions to do so within 30 days and to specify the grounds therefor, the majority concludes that defendants' rights to appeal are contingent upon compliance with that statute. But I respectfully suggest that the majority has confused the requirements of the post-trial motion statute by reading more into the statutory language than is there. Section 116—1 provides:

> "Motion for New Trial. (a) Following a verdict or finding of guilty the court may grant the defendant a new trial.
>
> (b) A written motion for a new trial shall be filed by the defendant within 30 days following the entry of a finding or the return of a verdict. Reasonable notice of the motion shall be served upon the State.
>
> (c) the motion for a new trial shall specify the grounds therefor."

I am unable to understand how the statute itself can be read to place any requirements or impose any penalties on defendants who prefer to seek appellate review immediately. As I read "shall" in sections 116—1(b) and (c), it merely mandates the timing and the contents of a motion for those who choose to file a motion for a new trial. Even if there were some ambiguity to section 116—1, the rule of lenity requires that this statute be construed strictly in favor of the defendant. (*Busic v.*

*United States* (1980), 446 U.S. 398, 406, 64 L. Ed. 2d 381, 389, 100 S. Ct. 1747, 1753.) Because we have often "recognized that a policy of lenity applies with respect to the interpretation of criminal statutes" *(People v. Haron* (1981), 85 Ill. 2d 261, 278), I find the construction the majority gives the statute even less acceptable.

Moreover, the majority's construction conflicts with our Rule 366, which this court has applied to criminal cases in the past. (See, *e.g., People v. Lilly* (1974), 56 Ill. 2d 493, 496 (applying Rule 366(a)); *People v. Murrell* (1975), 60 Ill. 2d 287, 292 (applying Rule 366(a)(5)); *People v. Scott* (1977), 69 Ill. 2d 85, 88 (applying Rule 366(a)).) In *Scott*, the court said: "Although Rule 366 is not specifically made applicable to criminal appeals (58 Ill. 2d R. 612), in *People v. Lilly* (1974), 56 Ill. 2d 493, the court, citing Rule 366, held that it had authority to vacate an incomplete judgment entered on a verdict." *(Scott*, 69 Ill. 2d at 88.) These decisions applied only Rule 366(*a*), but there is no reason why Rule 366(b)(3)(ii) should not similarly be applicable to criminal cases. Specifically, Rule 366(b)(3)(ii) provides that in nonjury trials, "[n]either the filing of nor the failure to file a post-trial motion limits the scope of review." (50 Ill. 2d R. 366(b)(3)(ii).) Considering that the sentencing in this case was a nonjury proceeding, Rule 366(b)(3)(ii) should be applied to preclude the majority's novel interpretation of section 116—1.

Finally, I note that the majority's new waiver rule is not supported by its citation of *People v. Pickett* (1973), 54 Ill. 2d 280, for that case, just as the majority points out in distinguishing *People v. Porter* (1986), 111 Ill. 2d 386, "is not in point, because in that case a post-trial motion was filed." 122 Ill. 2d at 191.

In justifying this new waiver rule the majority purports to promote judicial economy. (122 Ill. 2d at 190.) But the economy of a reargument before the same au-

thority is illusory. One can only expect perfunctory treatment of such post-trial motions given the trial court's perspective of relative costs. If the trial court erroneously accepts a defendant's request for a new trial, the cost of error is that of a new trial. Alternatively, if the motion is erroneously denied, the additional cost is only that of appealing the death sentence directly to this court, which in most cases is not as costly as a new trial. Therefore, a trial judge should, if motivated solely by judicial economy, deny every motion for a new trial except those which are overwhelmingly meritorious. Since judicial economy preordains the outcome in virtually every motion for a new trial, the requirement of making the perfunctory post-trial motion is itself uneconomical.

Ironically, the court's new waiver rule, though a convenient tool with which to dispose of Enoch's contentions in this case, may well spawn a new breed of ineffective-assistance-of-counsel claims based on failure to preserve issues for appeal. Although this court in *Caballero* viewed the post-trial motion as valuable for the purpose of "limiting the consideration to errors considered significant" (102 Ill. 2d at 31), the court's ruling today likely will cause trial counsel to burden trial courts with motions that argue every conceivable basis for a new trial. As I argued in my dissent in *Caballero*, 102 Ill. 2d at 52-53, defendants in capital cases should not be forced to make binding decisions regarding which issues to preserve for appeal without sufficient time to review the record thoroughly. If defendants are forced to make such hurried decisions, the results may be perverse. Because the post-trial motion statute itself (Ill. Rev. Stat. 1985, ch. 38, par. 116—1) places only time (and not substantive) constraints on post-trial motions, and because the new consequences that attach to failure to specify grounds for a new trial are so harsh, defense counsel will no longer be encouraged to do precisely what would

save judicial resources—spend time to weed out less promising arguments.

The record in this case reveals that following an offer of proof by the State and argument by counsel, the trial court found that evidence of prior offenses against the witnesses Burnside and McClain was admissible to show common design and the defendant's intent to commit rape, kidnapping, and armed robbery. The court informed the jury that the evidence would be admitted for a limited purpose, and later instructed the jury that the purpose was to show common design and criminal intent. On appeal the State argues that the evidence was properly admitted to demonstrate the defendant's *modus operandi* and intent. Purporting to find the plain error doctrine inapplicable, the majority refuses to consider whether the defendant's prior misconduct was properly admissible even though the evidence of attempted rape was exceptionally weak and the conviction on that count or aggravated kidnapping was a necessary factor in imposing the death sentence on the defendant. Not only is the court's reliance on the waiver doctrine misguided, but its discussion of the plain error exception is flawed. The court concludes that admission of the evidence "did not constitute plain error, because, as noted above, there was sufficient evidence, in addition to the now complained-of evidence, to support the finding of intent to commit rape and the conviction for attempted rape." (122 Ill. 2d at 198.) I do not understand how the majority can conclude that the plain error doctrine is inapplicable simply because of its view that the evidence was sufficient to support defendant's conviction. " '[T]he doctrine of plain error may be invoked in criminal cases where the evidence is closely balanced or where the error is of such a magnitude that the accused is denied a fair trial.' " (*People v. Friesland* (1985), 109 Ill. 2d 369, 375, quoting *People v. Black* (1982), 107 Ill. App. 3d 591,

593.) There is no requirement that defendant prove insufficiency of the evidence in order to invoke the plain error doctrine. In effect, the majority collapses the plain error inquiry into a mere question of whether the evidence was sufficient to support conviction. The determination whether an error constitutes a plain error that affects substantial rights (107 Ill. 2d R. 615(a)), however, has always been and should remain an inquiry independent of, and distinct from, an assessment of the sufficiency of evidence.

The general rule is that evidence of offenses not charged in the indictment on which a defendant is being tried is inadmissible. (*People v. McDonald* (1975), 62 Ill. 2d 448, 455.) "The law distrusts the inference that because a man has committed other crimes he is more likely to have committed the current crime. And so, as a matter of policy, where the testimony has no value beyond that inference, it is excluded." (*People v. Lehman* (1955), 5 Ill. 2d 337, 342.) However, evidence that tends to prove a fact at issue—such as motive, intent, identity or common design—or to establish the defendant's identity as the perpetrator by his distinctive *modus operandi* is admissible for the limited purpose of proving that fact, even though that evidence also reveals the commission of a separate offense. *People v. Lindgren* (1980), 79 Ill. 2d 129, 137; *People v. McDonald* (1975), 62 Ill. 2d 448, 455.

In considering the admissibility of the prior-offenses evidence, the trial court appears to have confused common design with *modus operandi*. A common design is a criminal scheme of which the crime charged is only one part. (*E.g.*, *People v. Brown* (1962), 26 Ill. 2d 308, 316; *People v. Steele* (1961), 22 Ill. 2d 142, 146; see generally 2 S. Wigmore, Evidence §304 (Chadbourn rev. ed. 1979) (proof of a scheme or design is used to prove the very doing of the act charged when such is at issue).) Since there is no evidence in the record of a larger criminal

scheme than the crimes charged, and the prior offenses in question were separate from and unrelated to those crimes, the evidence was inadmissible on a common design theory.

A *modus operandi*, on the other hand, is a pattern of criminal behavior so distinctive that unrelated crimes are recognizable as the work of the same person. Most often, establishing a *modus operandi*, in part through evidence of prior offenses, is useful in identifying the defendant as the perpetrator of the offense charged. Because of its potential prejudicial effect, evidence of prior unrelated offenses is admissible as proof of *modus operandi* "only upon a strong and persuasive showing of similarity" between those offenses and the crime charged. (*People v. Tate* (1981), 87 Ill. 2d 134, 141.) "Although the similarities need not be unique *** to the *** offenses being compared, there must be present some distinctive features that are not common to most offenses of that type in order to demonstrate *modus operandi*." 87 Ill. 2d 134, 142-43.

The primary crime with which the defendant was charged in this case was a vicious murder involving a post-mortem mutilation of the victim's body. He was also charged with attempted rape, aggravated kidnapping, armed robbery, and three felony murder counts based on those three charges. The incident to which Burnside testified was a rape, and that to which McClain testified was an attempted armed robbery. Although the State maintains that the events involving McClain constituted attempted rape, her testimony does not support that contention except by unwarranted inferences. Thus, the prior offenses appear to be quite different from the offenses at issue here.

The State argues, however, that there are substantial similarities among the three incidents. The offenses occurred at approximately three week intervals, and the

assailant in each incident initially approached each of the three victims in a nonthreatening manner. Each of the victims had her hands bound behind her back with materials found at the site of the crime. Burnside and McClain were also gagged; evidence as to whether Burns was gagged was equivocal. Each of the three victims was cut in the course of the assault on her.

Notably absent from the State's analysis of the similarities among the three incidents is any distinctive feature common to those offenses that is not common to many such crimes. There is nothing so nearly identical in the methods used in these three incidents as to mark them as the work of the same person. Moreover, there are differences among the three incidents at least as substantial as the similarities pointed out by the State. For example, the victim here was murdered in her apartment after having been accompanied there from work by the defendant. Burnside was raped in a garage after having been accosted by the defendant on the street. McClain was attacked in her apartment after having engaged in conversation with the defendant, who came to her door. Burnside and the victim were partially disrobed; McClain was not. Burnside was raped; the victim and McClain were not. McClain's assailant attempted to rob her; Burnside's did not. Although a knife was used in each of the three incidents, apparently it was not the same knife since the knife used in the Burn's murder was identified as a kitchen knife, and McClain stated that the defendant had a pocket knife. Burnside received a small cut in her back; McClain had a small cut in her stomach; the victim had her throat and face slashed, had a stab wound in the back, was repeatedly stabbed in the chest, and was cut open from her sternum to her pubic bone. The victim's hands were bound tightly with wire; both Burnside's and McClain's hands were bound loosely,

the latter's so loose that she was able to free her hands within a few minutes.

In sum, the three crimes share the single feature that in each instance the victim was injured by an assailant brandishing some type of knife. But the three crimes apparently were not committed with the same weapon (see *People v. Taylor* (1984), 101 Ill. 2d 508, 521), nor with the same criminal purpose. The three offenses in question were not "so nearly identical in method as to earmark them as the handiwork of the accused" (McCormick, Evidence §190, at 449 (2d ed. 1972)); thus, the prior-crimes evidence was, in my opinion, inadmissible to prove the identity of the perpetrator on a *modus operandi* theory.

The State argues that the prior-offenses evidence was admissible to establish defendant's intent to rape the victim and his guilt on the charge of attempted rape. Evidence regarding defendant's rape of Burnside was, I believe, properly admissible for that purpose. Although the defendant argues that Burnside's testimony only tends to prove his propensity to commit the crime charged, the evidence in fact tends to establish that in assaulting the victim he intended to rape her. The trial court received this testimony and issued a limiting instruction that it be considered to establish defendant's intent. That intent was the key issue on the attempted rape charge, an issue for which the Burnside rape had tangible probative value. *People v. Nye* (1951), 38 Cal. 2d 34, 37, 237 P.2d 1, 3 ("The evidence of the attempt to rape Miss W. was clearly admissible to show that defendant's acts against Mrs. P. were committed with the intent to commit rape"); *cf. People v. Peyser* (1942), 380 Ill. 404 (in prosecution for criminal abortion, evidence of prior criminal abortions held admissible to establish criminal intent); see generally 2 S. Wigmore, Evidence §357 (Chadbourn rev. ed. 1979) ("former acts of the kind are relevant to

negative the intent as being of any other kind than to commit rape").

McClain's testimony, however, was not probative of the defendant's intent to rape the victim. Whether the defendant would have raped McClain had she not escaped is entirely speculative; thus, the testimony should not have been admitted because its prejudicial potential outweighed its negligible tendency to establish a fact in controversy.

Nor was McClain's testimony admissible to establish intent on the armed robbery allegation. Unlike the attempted rape charge, the armed robbery count on which the defendant was acquitted did not allege an inchoate offense, so the most probative evidence of intent would have been proof of the completed offense. In *People v. Rogers* (1927), 324 Ill. 224, evidence of Rogers' prior crimes of taking indecent liberties was not admissible to prove the intent to commit indecent liberties in the case then at bar. "Such was shown by the act itself." (324 Ill. 224, 233.) Therefore, evidence of prior crimes to establish intent may only be admitted to establish intent for a completed offense where a defense is premised on lack of intent or knowledge. (*People v. Wilson* (1970), 46 Ill. 2d 376, 381; *People v. Fiorito* (1952), 413 Ill. 123, 131; see *United States v. Silvern* (7th Cir. 1973), 494 F.2d 355, 360.) To hold otherwise would expand the contours of the intent exception to the boundaries of the general rule itself. *United States v. Miller* (7th Cir. 1974), 508 F.2d 444, 450 ("Since intent is always an issue, it would emasculate the rule to hold that evidence of other crimes may always be admitted to show criminal intent").

Because of this unduly prejudicial and improperly admitted evidence, the defendant's conviction for attempted rape should be reversed and that portion of the case remanded for a new trial. The evidence of defendant's intent to rape the victim is simply too equivocal for

the admission of McClain's testimony to be regarded as harmless error.

In reliance upon its waiver analysis, the majority opinion also rejects the defendant's contention that he should not have been convicted of aggravated kidnapping because he did not confine the victim to any extent greater than that inherent in the other crimes charged. Aggravated kidnapping occurs when "[a] kidnapper within the definition of paragraph (a) of Section 10—1 *** [c]ommits the offense of kidnapping while armed with a dangerous weapon." (Ill. Rev. Stat. 1983, ch. 38, par. 10—2(a)(5).) Section 10—1 includes within the definition of kidnappers "a person [who] knowingly *** [a]nd secretly confines another against his will." (Ill. Rev. Stat. 1983, ch. 38, par. 10—(a)(1).) Rather than merely accepting the fact of secret confinement to establish that element of aggravated kidnapping, the defendant argues that the secret confinement must be of substantial duration. Otherwise, the defendant argues, crimes such as murder, rape and robbery would frequently fall within the broad statutory definition because some confinement is virtually inherent in those crimes.

In *People v. Levy* (1965), 15 N.Y.2d 159, 204 N.E.2d 842, 256 N.Y.S.2d 793, the New York Court of Appeals considered this question in a case where the victims had been robbed in their automobile while it was driven some 27 city blocks. The New York court decided that the asportation involved was merely incidental to the robbery. "In essence the crime remained a robbery although some of the kidnapping statutory language might literally also apply to it." (15 N.Y.2d 159, 165, 204 N.E.2d 842, 844, 256 N.Y.S.2d 793, 796.) Concerned that prosecutors might take advantage of broadly drafted kidnapping statutes to expose defendants to more severe criminal sanctions than their actions and intentions warranted, the court of appeals limited the broad statutory defini-

tion of kidnapping then in effect to embrace only " 'kidnapping' in the conventional sense in which that term has now come to have acquired meaning." (15 N.Y.2d 159, 164-65, 204 N.E.2d 842, 844, 256 N.Y.S.2d 793, 796; see *People v. Lombardi* (1967), 20 N.Y.2d 266, 229 N.E.2d 206, 282 N.Y.S.2d 519.) The restrictive definition of kidnapping adopted in New York has found acceptance in other States. See *People v. Daniels* (1969), 71 Cal. 2d 1119, 459 P.2d 225, 80 Cal. Rptr. 897; *People v. Adams* (1973), 389 Mich. 222, 205 N.W.2d 415; *Wright v. State* (1978), 94 Nev. 415, 581 P.2d 442; *State v. Wilder* (1971), 4 Wash. App. 850, 486 P.2d 319; see also *State v. Buggs* (1976), 219 Kan. 203, 547 P.2d 720; but see *Samuels v. State* (Del. 1969), 253 A.2d 201; *Lester v. State* (1970), 9 Md. App. 542, 266 A.2d 361; *State v. Morris* (1968), 281 Minn. 119, 160 N.W.2d 715; *State v. Ginardi* (1970), 111 N.J. Super. 435, 268 A.2d 534.

This court considered the *Levy* rule in *People v. Canale* (1972), 52 Ill. 2d 107, where the victim had been forced to drive to a vacant lot where she was then raped. Recognizing that the "apparent rationale and purpose of *Levy* was to prevent, in an excess of prosecutorial zeal, the elevation of the lesser crimes, under New York law, of rape and robbery to the more serious crime of kidnapping," the court affirmed Canale's conviction for aggravated kidnapping because the penalty for aggravated kidnapping, an indeterminate sentence of at least two years, was at that time less severe than those provided for rape and robbery. 52 Ill. 2d 107, 118.

Since *Canale*, however, the penalty for aggravated kidnapping has been greatly increased; aggravated kidnapping, other than for ransom, is now punished as a Class 1 felony, for which the sentence may range from 4 to 30 years' incarceration. (Ill. Rev. Stat. 1983, ch. 38, pars. 10—2(b)(2), 1005—8—1(a)(4), 1005—8—2(a)(3).) The appellate court has reacted to the relatively greater

sanction now imposed for aggravated kidnapping. In *People v. Smith* (1980), 91 Ill. App. 3d 523, 529, the court identified four factors to be considered when deciding whether an incident of asportation or secret confinement as part of another crime rises to the level of statutory kidnapping:

> " '(1) [T]he duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense.' *Government of the Virgin Islands [v. Berry* (3d Cir. 1979)], 604 F.2d 221, 227."

The interpretation of aggravated kidnapping accepted by the majority in this case is even more critical than where a greater period of incarceration results from the kidnapping conviction. The question here is whether a defendant should be sentenced to death for murder because the prosecutor argued that the short period of detention which accompanies many murders fits the statutory definition of aggravated kidnapping—one of the aggravating factors that may trigger imposition of the death penalty in Illinois (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)). This very problem was anticipated by the drafters of the Model Penal Code: "Examples of abusive prosecution for kidnapping are common. Among the worst is use of this means to secure a death sentence." (Model Penal Code §212.1, Comments (Tent. Draft No. 11, 1960).) In cases of murder, rape or robbery in which a detention or asportation occurs incidentally to the substantive crime, and the detention or asportation thereby does not materially increase the victim's peril, a conviction for kidnapping or aggravated kidnapping is purely redundant and should not be used to justify the imposi-

tion of capital punishment. It is absurd to conclude that "[t]he criminalogically non-significant circumstance that the victim was detained or moved incident to the crime" was intended by the General Assembly to "determine[] whether the offender lives or dies." Model Penal Code §212.1, Comments (Tent. Draft No. 11, 1960).

The court should take this opportunity to distinguish between asportations and secret confinements that are merely incidental to an underlying forcible felony and those that in fact implicate the separate dangers kidnapping statutes address. It has been suggested in the Model Penal Code that the distinction is a matter of time or distance, and the Code resolves the matter by requiring a "substantial" asportation or period of confinement to charge kidnapping. But that distinction ignores what I view as the real harm that differentiates kidnapping from unlawful restraint: that by carrying the victim away or secreting the victim, the victim is not only confined but also dispossessed of legal and societal protection—as though the victim had been sold into slavery (*Exodus* 21:6) or removed from the country of citizenship (see 4 W. Blackstone, Commentaries 219). Given the evil peculiar to kidnapping, it follows that it is the act of denying those protections in addition to perpetrating an act of murder, rape or robbery, and not merely the duration of the secret confinement, that suggests a kidnapping has been committed.

I believe that the intention of the General Assembly and the interests of criminal justice are best served by excluding from the statutory definition of kidnapping an asportation or confinement that occurs incidentally to another forcible felony; a denial of legal and societal protections is assumed to occur during the time an independent crime is being perpetrated against the victim. Of course, "it is the rare kidnapping that is an end in itself; almost invariably there is another ultimate crime."

(*People v. Miles* (1969), 23 N.Y.2d 527, 540, 245 N.E.2d 688, 695, 297 N.Y.S.2d 913, 922.) Therefore, I suggest that if the asportation or confinement in a particular case is not inherent in the substantive crime, but substantially facilitates the commission of that other offense and enhances the risk to the victim, then a conviction for kidnapping could be affirmed.

As the jury found, the crime in this case was essentially murder in that the defendant stabbed the victim knowing that the wounds he inflicted created a strong probability of death. The murder might as effectively have been accomplished at a distance with poison or even a gun, and the defendant would clearly not be guilty of kidnapping. That the method by which murder was committed in this case required momentary confinement cannot, in my opinion, supply the basis for an aggravated kidnapping conviction. The heinous nature of the victim's death may support an extended sentence, but it should not be contorted to shape a statutory aggravating factor supporting a capital sentence. Compare Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(2) with Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7).

Thus, because I would reverse the defendant's convictions for both attempted rape and aggravated kidnapping, I cannot join in the majority's decision to affirm the defendant's sentence of death. Without a proper conviction for one of the felonies included as aggravating factors in our death penalty statute (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)(c)), the death sentence cannot be imposed in this case. Moreover, I continue to adhere to my opinion that the Illinois death penalty statute is unconstitutional. (See *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting). See also *United States ex rel. Lane v. Lewis* (C.D. Ill. Jan. 8, 1987), No. 86-2086, slip op. at 29 (expressing "grave doubt" over the constitutionality of the Illinois death penalty statute).) In

fact, the constitutional problems set forth in the dissent in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 544-45, that "the statute contains no guidelines to prevent the arbitrary exercise of discretion by the State's Attorney," are exacerbated by the majority's decision. By upholding a death sentence based in part on an expansive definition of aggravated kidnapping, the court expands the prosecutor's discretion and thereby heightens my objections that the death penalty statute violates both article II, section 1, of the Illinois Constitution and the eighth amendment to the United States Constitution.