THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BERNELL HAMPTON, Defendant-Appellant.

First District (1st Division)   No. 1—90—0815

Opinion filed August 24, 1992.—Rehearing denied March 17, 1993.— Modified opinion filed March 22, 1993.

Michael J. Pelletier and James E. Chadd, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb, Brian Clauss, and Sandra Z. Nueschen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

A jury found defendant Bernell Hampton guilty of aggravated criminal sexual assault against the victim, A.A. The circuit court sentenced defendant to 25 years' imprisonment. Defendant appeals his conviction and sentence arguing that the circuit court improperly handled his *Batson* motion and that he is entitled to a hearing on whether or not new counsel should be appointed to investigate claims of ineffective assistance of counsel.

Prior to trial, on December 8, 1989, defense counsel informed the circuit court that he and his investigators had made several unsuccessful attempts to locate A.A. Defense counsel told the circuit court that A.A. was no longer living at the address given to him by the State. Defense counsel, although admitting that A.A. was not required to speak with him, requested that the State give him A.A.'s correct address and phone number. The State replied that it had given defense counsel all its information regarding A.A.'s whereabouts. Again, on January 29, 1990, defense counsel requested the circuit court to order the State to produce A.A.'s current address or phone number. The State disclosed that it did not know A.A.'s current address or phone number because A.A. was afraid to give out that information. The State explained that A.A. contacts it; the State

does not contact A.A. The State, however, offered to make A.A. available to defense counsel on February 7, 1990, the day defendant's trial was set.

The first day of trial, defendant requested that he be allowed to personally make his opening statement. The court denied the request after defendant revealed that he still wanted the public defender to represent him.

During *voir dire*, 28 people were questioned. Defendant used nine peremptory challenges, while the State used three and the court excused two for cause on defendant's motion. After the jury and the two alternates were sworn, defendant moved for a mistrial alleging that the State had engaged in purposeful discrimination to exclude blacks. The court denied the motion.

A.A. was the first witness called at defendant's trial. A.A. testified that on April 9, 1989, she was walking down 49th Street and King Drive at 7 a.m. A.A. stopped to light a cigarette, when defendant also stopped and offered to light it. After lighting A.A.'s cigarette, defendant asked her where she was going, did she need any money and would she like to have breakfast with him. A.A. declined the invitation, but defendant persisted by saying he knew of a place where they could have a good home-cooked breakfast. A.A. relented and got into defendant's car with him. They drove to 51st Street and Racine Street. Defendant explained that he needed to stop at his house to get money. A.A. said that she would wait for defendant in the car, but defendant insisted she go inside the house with him. Defendant opened the door to a two-flat building and A.A. entered. When A.A. discovered the building was vacant, containing only boxes and garbage, she turned to leave. Defendant, however, had chained the door and taken a four-inch-long gun out of his blazer.

A.A. testified that defendant pointed the gun at her and said "that he just got out of prison for murder one for nine and a half years and what he thought about killing a red bitch like me was nothing, so I shouldn't play games." Defendant ordered A.A. to the bedroom and to take off all her clothes as he pointed the gun at her. Then, defendant ordered A.A. to get onto the bed.

Next, defendant took off all his clothing except his boxer shorts and got on the bed. While holding the gun, defendant forced A.A. to put her mouth on his penis saying, "Give me a blow job, bitch, now." A.A. did as she was told. After that, defendant forced A.A. to lick his anus. Then, defendant pushed A.A. down on the bed and forced his penis inside her vagina. As defendant did this, he cursed A.A. and told her that he would shoot her and throw her in the dumpster.

Defendant also hit and slapped A.A. Defendant continued to force A.A. to perform various sexual acts in various positions for four hours. Throughout this ordeal, defendant continued to point the gun at A.A., putting it in her mouth and holding it to her head. A.A. begged defendant not to hurt her and to let her go, at one point informing defendant that she was 16 years old and had two babies who relied solely on her for support and care. Defendant replied, "I have no sympathy for you."

Defendant eventually got off the bed and told A.A. that he was going to let her go. Defendant insisted that he walk out of the building with A.A. A.A. got dressed, went to the door and was attempting to leave, when defendant said, "No, I changed my mind, you're not going anywhere." A.A. became hysterical and tried to get out of the door. A.A. located a nail sticking out of the door, pulled on it, the door opened and she ran out with defendant behind her. A.A. saw a police car and ran to it. A.A. began banging on the window of the police car. A.A. told Officer Daniel Mallon that defendant had raped her and that he had a gun.

Further, A.A. testified that she was taken to Mercy Hospital. A.A. had a large bruise on her left cheek and severe soreness in her genital area. A.A. stated that she left Chicago one week after the incident.

On cross-examination, A.A. denied that she had solicited defendant for money in exchange for sex. A.A. also denied taking drugs the day prior to and/or the day of the incident. A.A. stated that she did not use drugs, except that she had experimented with marijuana in the early 1980s.

Officer Mallon testified on behalf of the State. He stated that while on patrol on April 9, 1989, he saw A.A. frantically waving her arms. When he stopped the car, A.A. started banging on the window. A.A. was hysterical and sobbing heavily. She explained that she had just been raped and that the man had a gun. A.A. pointed to defendant on the other side of the street and told Mallon that he was the man who had raped her. Mallon ordered defendant to stop. Defendant, however, ran up the stairs into the building at 5155 South Racine Street. Mallon drew his gun and followed defendant. Mallon found defendant in the kitchen and placed him under arrest. Mallon along with another officer searched the building and the adjacent lot, which was overgrown with weeds and had abandoned cars, tires and other junk on it. They did not recover the gun. Mallon commented that they were unable to search every place where a small gun could have been hidden.

Mary Hertz, a nurse at Mercy Hospital, testified on behalf of the State that she interviewed A.A. at 1:35 p.m. on April 9, 1989. A.A. informed Hertz that she had been sexually assaulted orally and vaginally. A.A.'s face was traumatized and she was crying throughout the interview. A.A. told Hertz that she had ingested either ampicillin or Robitussin for a cold, but never said anything about taking drugs on that day.

Defendant called Dr. Warren Tripp, a resident physician at Mercy Hospital on April 9, 1989, to testify on his behalf. Tripp treated A.A. on that date. Tripp had no independent recollection of the incident and testified only after reviewing his medical notes. Tripp testified that A.A.'s face was bruised, but that he had no notes concerning whether A.A. complained of vaginal soreness. Tripp testified that his notes indicated that:

"[A.A.] was apparently invited to this person's place *** she used IV cocaine drug for the first time and that he held her at gun point following that for a period of between 7:00 o'clock and noon and repeatedly raped her. That's what she told me as I understood it and I recorded in my notes."

Defendant's son Claudel Jackson testified that he owned a building at 5155 South Racine Street, but that defendant was not living in it on April 9, 1989. Jackson admitted, however, that defendant had access to the building and was storing his belongings there.

After closing arguments, the jury found defendant guilty of aggravated criminal sexual assault. At the sentencing hearing, defendant was allowed to address the court. Defendant made allegations of prosecutorial misconduct and ineffective assistance of counsel based on the rulings of the court and the State's Attorney's conduct. Defendant was sentenced to 25 years' imprisonment. Now, defendant appeals.

■ First, defendant argues that he is entitled to a new *Batson* hearing because the circuit court conducted a procedurally incorrect hearing. Defendant made a *Batson* motion for mistrial, alleging that the State had used two of its three peremptory challenges on African-Americans. Prior to ruling on whether defendant had made a *prima facie* showing of racial discrimination under *Batson*, the circuit court asked the State to give explanations for its use of the two peremptory challenges. Defendant, however, not only failed to object to the alleged procedurally incorrect hearing at trial, but also failed to include the objection in his written post-trial motion. In order to preserve an issue for appeal, a contemporaneous trial objection and a written post-trial objection must be made. (*People v. Enoch* (1988), 122 Ill. 2d 176,

522 N.E.2d 1124.) Failure to raise an issue in a written post-trial motion precludes reversal or review even if it involves a constitutional right. (*People v. Friesland* (1985), 109 Ill. 2d 369, 488 N.E.2d 261.) Defendant, therefore, waived review of the *Batson* issue.

Second, defendant argues that the circuit court erred in denying his *pro se* motion for a new trial based on ineffective assistance of counsel. At defendant's sentencing hearing, he stated:

"[The circuit court] indicated to [the State], make [A.A.] available to Defense, there was never any effort, good faith effort on [the part of] the State to make this star witness, [A.A.], available to the Defense, and based on that I am alleging his ineffective assistance of counsel, not only against my attorney here but the whole Public Defender's Office, the case load is too heavy.

\* \* \*

I'm also charging ineffective assistance of counsel, that should be made part and partial [*sic*] of this record—

\*\*\*

—based on the rulings of the Court and the acts of the State's Attorney's Office."

■ Defendant's comments indicate that he was attempting to lodge an ineffective assistance of counsel motion against the State and the circuit court because there was no good-faith effort to make A.A. available to defense counsel. The record reveals that the State did cooperate with defense counsel by providing them with A.A.'s last known phone number and address. Furthermore, defendant never requested that new counsel be appointed to him. As in *People v. Reed* (1990), 197 Ill. App. 3d 610, 554 N.E.2d 1115, there are no allegations that support an ineffective assistance of counsel claim against defendant's counsel, other than defendant's comment that the public defender's office's case load was too heavy. The circuit court cannot be expected to formulate a specific ineffectiveness claim from such ambiguous language. (*Reed*, 197 Ill. App. 3d at 612, 554 N.E.2d at 1117.) We, therefore, hold that defendant is not entitled to a hearing on whether or not new counsel should be appointed to investigate claims of ineffective assistance of counsel.

For the foregoing reasons, the conviction of the circuit court of Cook County is affirmed.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.