THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD JONES, Defendant-Appellant.

First District (4th Division)   No. 1—90—1683

Opinion filed September 17, 1992.

Ann C. McCallister, of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

A jury convicted Edward Jones and Maurice Staten of armed robbery and home invasion. (Staten is not a party to this appeal.) Both men received 20-year prison terms, which were later reduced to 16 years. On appeal, defendant Jones argues that the State did not prove him guilty of the charges beyond a reasonable doubt. He also claims he was denied a fair trial because the State told the jury that police officers are more believable than other witnesses and that discrepan-

cies in police reports are not significant because such reports are not evidence.

We affirm.

BACKGROUND

According to the trial testimony, Stephanie Banks arrived at her father's apartment on West 66th Street with her boyfriend at approximately 11 p.m. on December 28, 1988. Stephanie's uncle, Ricky Banks, who also lived at the apartment, was there, although her father was not. Stephanie kept some jewelry in a box at the apartment.

About an hour later, Stephanie heard a noise in the hallway and looked out a peephole in the front door. She saw a man with a ski mask holding another man up against the wall. Stephanie immediately called the police and reported a robbery in progress. As soon as she hung up, the front door of the apartment was kicked in and Stephanie, her uncle, and her boyfriend hid in the pantry. From the pantry Stephanie saw one of the intruders' arms when he came into the kitchen and reached for a radio. He then ordered them to come out with their hands raised.

Stephanie saw a man wearing a white ski mask trimmed in blue, holding a "big, long silver gun." He pointed the gun in her face, pushed her, and told her to go into the bedroom. As she was walking she saw two additional people, one standing by the kitchen sink holding a shotgun and the other wearing a green sweatshirt and holding a police club. Stephanie was told to put her hands against the wall and keep her head down. She could not observe any of the intruders from this position.

Stephanie next heard one of the men yell that the police were coming and then she heard the sound of breaking glass. The police arrived and escorted her to the police station where she regained possession of her jewelry box. She also viewed a lineup but was unable to identify any of the intruders.

Ricky Banks, her uncle, testified that shortly after midnight on December 29, he, too, heard noises and looked out of the peephole in the door. He saw three men, two with ski masks. He thought it sounded like they were fighting. After his niece notified the authorities he hid with her in the pantry. They could hear people going through drawers in the bedroom.

After a short time Ricky heard an intruder yell at them to come out of the pantry. Ricky was told to keep his head down, but he caught a glimpse of the second intruder, who stood in the doorway

holding a shotgun and wearing a ski mask. He noticed that a third man wore a light green sweatshirt and held a police baton.

Ricky testified that when Stephanie was ordered to leave the kitchen, he was told to keep his head down and his hands against the wall. One of the intruders reached into his pocket and removed five or six $20 bills. Then he heard the intruders break the window in the kitchen and leave.

Two detectives took Ricky to the police station where he viewed a lineup. He could not identify defendants. At the station, he told the police that he had $100 or $120 in his pocket when he was robbed, not the $59 and food stamps that were listed on the police report.

Three police officers who had arrived at the scene about nine minutes after midnight testified at trial. Officer Herman Slaughter testified that he was one of the ones who responded to the robbery-in-progress call, arriving at the victims' apartment with his partner, Michael Wilson. As he walked toward the residence, he heard the sound of breaking glass coming from the rear of the building. He saw a man hang from the victims' window ledge and then fall to the sidewalk and run. Slaughter identified this individual in court as Maurice Staten. Immediately after Staten hit the ground, another man followed him out the window. Slaughter identified this man as defendant, Edward Jones. Defendant was wearing a long dark jacket and a white knit wool hat. Both suspects jumped over a fence and ran east, pursued by the officers. Staten and defendant split up and Officer Slaughter ran west after defendant while Officer Wilson followed Staten, who was going north. Slaughter could not see defendant's hands as he ran because his long jacket was "flapping out like a cape." Eventually he caught up with defendant and stopped him as he was diving under a porch. After the arrest, Slaughter noticed a white ski mask on the ground approximately two feet from defendant.

After subduing defendant, Slaughter ran to join his partner and the other officers who had taken Staten into custody. Slaughter then retraced defendant's path with another officer, Jones. The officers found a revolver under a truck and a brown plastic jewelry box and jewelry near the side of a building. Slaughter then went to the police station and made out a report, which stated "both offenders positively ID'd by victim at scene and also witnesses." Slaughter said he did not get this information from the victims directly, but believed he had heard this information from someone else.

Officer Wilson, Slaughter's partner, also was present at the scene. Wilson identified both defendants in court as the men who had jumped out of the window and climbed over the fence. According to

Wilson, Staten wore a stone-washed denim jacket and defendant wore a white ski mask pulled over his face. Wilson chased Staten north until another officer, Jones, apprehended the suspect. Wilson then retraced Staten's route and found a loaded shotgun lying in the snow under the window from which where the men had jumped.

Officer Richard Jones also testified. He was one of the officers on the scene and heard Slaughter exclaim that glass was breaking in the back of the building. Officer Jones identified the two defendants at trial as the two men he observed jumping over a fence. Officer Jones joined the chase and was positioned so that defendant and Officer Slaughter were running toward him. Officer Jones saw defendant throw a weapon under a vehicle as he fled. Officer Jones also saw defendant remove his white hat, just before Slaughter tackled defendant.

Officer Jones ran after Staten and arrested him. The officer then backtracked to where he saw Staten throw the gun and recovered it. He also recovered a ski mask and a jewelry box that later was identified as belonging to Stephanie Banks. At the police station, Jones searched the offenders and recovered $59 and a quantity of food stamps. Also recovered and listed in an inventory were a brown wooden baton and a second ski mask. Regarding the money allegedly taken from Ricky Banks, Officer Jones testified that Banks did not tell him he was missing $59 plus food stamps. The officer admitted that he did report that amount, which was the money recovered from the defendants, because Banks was upset at the time and unsure of the amount of money that had been taken from him.

Stephanie Banks and Ricky Banks identified watches and the jewelry box as having been taken from the apartment during the robbery. At the lineup held in the police station later that night, neither victim could identify the intruders.

Joyce Jones testified on behalf of her husband, defendant. On the night of the incident she was in her husband's company at his aunt's house in the 1600's block of West 66th Street. Defendant worked as a janitor for his aunt, who owns the building located at that address. Around midnight, Joyce and Edward Jones walked to a gas station at 57th and Damen to buy cigarettes. On their way back, Edward stopped about a block away from his aunt's house and told Joyce he was going into the alley to relieve himself. She waited for him and about 20 minutes later saw him in police custody on the corner.

Codefendant Maurice Staten testified that he had gone to the address on West 66th street to buy marijuana from Ricky Banks. He said he had been buying it from Banks on a weekly basis. As he was

about to leave the apartment building he saw two men in ski masks; one had a shotgun and the other a large handgun. Staten testified that he was wearing a gold chain and Gucci watch, which the two men forced him to give to them. According to Staten, the men forced him back upstairs and into Ricky Banks' apartment. Once inside, the shorter of the two men held him against the dining room wall near the entrance to the kitchen. Staten denied having a billy club. The taller intruder found the victims in the pantry. Staten saw a young woman pass him in the dining room but could not see her face. He said the shorter man told him to go into the kitchen and face the wall by the window. He did so and then heard someone say that the police were coming.

According to Staten, the taller man broke the kitchen window and forced him through it. After he fell to the ground the other two intruders jumped out of the window and fled. Staten said he walked through the gangway behind the building and just as he was halfway through, Officer Slaughter arrested him.

On cross-examination, he denied that he had been convicted of armed robbery in the past. In rebuttal, the State introduced certified copies of his two prior guilty pleas to armed robbery in 1980.

Ricky Banks also testified in rebuttal, denying that he sold marijuana and denying Staten's claim of owning one of the watches recovered.

The jury convicted both defendants of all counts.

OPINION

I

Defendant first contends that he was not proved guilty beyond a reasonable doubt because (1) the victims could not identify him or describe the "distinctive full-length coat" he was wearing when arrested near the scene and (2) the police officers' testimony was severely impeached.

The elements of armed robbery include the taking of property from the person or presence of another by use of force or threat of imminent use of force while armed with a dangerous weapon. (Ill. Rev. Stat. 1987, ch. 38, par. 18—2.) Home invasion requires proof that a defendant knowingly entered the dwelling place of another, knowing or having reason to know that one or more persons were present, and, while armed with a dangerous weapon, used force or threatened force upon anyone in the dwelling. Ill. Rev. Stat. 1987, ch. 38, par. 12—11(a)(1).

■ The record in this case includes the testimony of the two victims and three police officers at the scene. While Ricky and Stephanie Banks were unable to view the faces of the intruders, two of whom wore ski masks, Staten and defendant practically jumped into the arms of the policemen arriving at the scene. The defendant was identified by all three officers at trial as one of the suspects who had fled the victims' apartment after the robbery. The victims' positive identification of defendant was not necessary under these circumstances. In the brief time they observed their assailants before being forced to look down and face a wall, Stephanie and Ricky Banks saw two masked assailants holding large firearms and another, unmasked intruder who was wearing a green shirt and holding a wooden baton. Stephanie testified she only saw the green-shirted intruder for "about a second." The victims were able to generally describe the assailants' weapons and ski masks, which were recovered by the police. The victims' inability to pick defendant out of a lineup as one of the intruders does not, therefore, create a reasonable doubt of his guilt; indeed, it would be most unlikely if the victims had been able to positively identify men who were wearing ski masks.

Defendant nonetheless asserts that the officers were not worthy of belief because of certain discrepancies in the testimony. Slaughter testified that defendant wore a long dark coat, which was introduced as an exhibit at trial. Stephanie Banks did not recognize it, however. According to defendant, he was the only one wearing such a "highly distinctive" full-length coat in the police lineup and the victims' inability to identify the coat fatally undercuts the identification.

We find the argument unpersuasive. Victims confronted in their own homes by gun-wielding intruders who have just kicked in the door are not likely to study the apparel of their assailants, particularly when they have been directed to keep their heads down and then ordered to put their hands up against a wall. Such items as ski masks and large guns are quite likely to get the victims' attention, while details of clothing or other identifying matters might not register. Moreover, if defendant was not present in the victims' apartment during the armed robbery, it is difficult to explain how it was that three police officers watched him jump out of the victims' window and flee. Defendant apparently would argue that the officers were lying about what they saw. In support of this contention, he states that Officer Jones said he saw defendant remove a ski mask as he fled, while Officer Slaughter, who was chasing defendant, did not see him remove the mask. According to defendant, Officer Jones' testimony is thus rendered highly suspect, particularly since he supposedly was also

watching Staten run at the same time he saw defendant remove the mask.

We find this supposed discrepancy to be of minor significance. Both officers, Jones and Slaughter, testified that they found the ski mask in question close to where defendant was apprehended. While Slaughter did not actually see defendant removing the ski mask from his head during the chase, Slaughter did notice that defendant was wearing a white knit cap. A white knit ski mask pulled up off the face might well look like a cap, and the fact Slaughter did not see its removal hardly impugns either Slaughter's or Jones' credibility. The two men were at different vantage points and Slaughter was concentrating on catching a fleeing suspect. Slaughter also testified that defendant's long coat was "flapping out like a cape," which prevented him from observing defendant's hands.

We also reject defendant's attempt to create a reasonable doubt of his own guilt by pointing to the discrepancy in the amount of money recovered from the defendants and the amount of money Ricky Banks claimed had been removed from his pocket. Banks said that five or six $20 bills were taken from him. The police report shows that $59 dollars was recovered, not the larger amount. We find this point to be of limited relevance, however. Even assuming Banks was not mistaken about the amount and denomination of bills in his pocket, the evidence indicates that one of the three intruders escaped without detection. He could have taken Banks' money and the $59 recovered could have belonged to defendants.

■■ Finally, we find unpersuasive defendant's attempt to cast serious doubt on the officers' testimony because of an error in the arrest report prepared by Officer Slaughter. The report suggests that the victims positively identified the assailants, while the evidence is undisputed that the victims could not, and did not, identify the men charged with the crime. Officer Slaughter testified, however, that when he made out the report he had not personally asked the victims about the identification and he believed that someone else at the scene had told him that the victims had positively identified the offenders.

The victims' inability to identify the assailants beyond the ski masks and guns is not disputed in the evidence. Therefore, the error in the arrest report is immaterial to the issue of the *victims'* identification of defendant. Likewise, the error does not undermine the independent identification testimony of the three officers who actually saw the defendant fleeing the scene. Officer Slaughter explained why he had included in the arrest report the statement that the victims

had identified the perpetrators. Presumably, the jury found the explanation plausible. In any event, we find the impeachment value of the error in the arrest report to be marginal because it amounts to impeachment on a collateral issue. The officers' eyewitness identification, along with the victims' testimony as to the circumstances of the crime, combined to create strong evidence of guilt. Defendant was caught virtually red-handed at the scene.

We must affirm the conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313.) The standard of review when a defendant challenges the sufficiency of the evidence is to determine whether the record, viewed in the light most favorable to the prosecution, could reasonably support a finding of guilty beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453.) We find that the evidence of record clearly supports defendant's conviction. Accordingly, we reject the evidentiary challenge to defendant's convictions.

## II

■ We also hold that the alleged trial error is without sufficient magnitude to warrant reversal. Defendant argues that the prosecutor improperly commented on the veracity of the police officers, "whose job it is to serve and protect and stop crime and apprehend criminals." The prosecutor asked the jury whether they were going to believe the police who saw the defendants escape from the window and run, or whether they would believe "two guys, one of whom *** ha[d] lied *** twice already, and another who ha[d] obvious reasons to lie?"

Defendant did not object to the above comments at trial or in the post-trial motion, which means that the issue is waived unless it falls within the plain error doctrine. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) According to defendant, the above comments were highly improper, constituting reversible error, because a prosecutor is not allowed to argue that a witness is more credible solely because of his status as a police officer. (*E.g., People v. Clark* (1989), 186 Ill. App. 3d 109, 115-16, 542 N.E.2d 138.) While it is true that an officer's testimony is to be evaluated in the same manner as that of any other witness (*People v. Ford* (1983), 113 Ill. App. 3d 659, 447 N.E.2d 564), challenges like the one made here are not generally reviewable under the plain error doctrine unless the testimony is closely balanced. In *Ford*, the court entertained the issue under the plain error doctrine because the evidence was closely balanced and "the outcome of [the] case depend[ed] on which of two witnesses the

jury believe[d] to be more credible." (113 Ill. App. 3d at 661, 447 N.E.2d at 556.) In that case, the State's only witness was a deputy sheriff who said the defendant sold her cannabis. The defendant, however, offered plausible testimony to support her theory of the case. The court therefore considered the State's emphasis on the deputy's credibility to be prejudicial.

Unlike the evidence in *Ford*, in the pending case the evidence cannot be said to be closely balanced. The State presented the testimony of the three officers who personally observed defendant flee from the victims' apartment. The victims provided information about the ski masks and weapons, which were recovered at the scene. Only defendant's wife testified on behalf of defendant, and if her testimony was intended to suggest defendant was merely in the wrong place at the wrong time, it falls short of establishing such a scenario. She testified that defendant told her he was going down the alley to relieve himself. At the time, however, he was less than a block from his aunt's house. His wife testified she waited about 20 minutes, and then saw him under arrest. This does not constitute closely balanced evidence. The plain error doctrine, therefore, does not apply.

We believe, moreover, that the prosecutor's remarks were not wholly uncalled for, given the defense attempts to attack the officers' credibility and veracity. The defense attorney in opening statement suggested to the jury that "men in uniform" have certain biases and different perspectives and may find "their senses are changing and *** maybe getting better than they were originally." (See *People v. Spiezio* (1989), 191 Ill. App. 3d 1067, 1075-76, 548 N.E.2d 561 (Prosecution's remark that officers were more credible witnesses because of their sworn oath of office was proper comment on the evidence and invited by defense arguments that the police were lying in an attempt to frame him).) We conclude that the challenged remarks, even if improper, were not of the type that could fairly be said to be a material factor in the defendant's conviction. See *People v. Shum* (1987), 117 Ill. 2d 317, 347, 512 N.E.2d 1183.

■ Defendant's final challenge targets the prosecutor's reference to police reports as not being evidence. According to defendant, the State thereby urged the jury to disregard the impeachment value of the police reports entirely, in favor of the officers' trial testimony.

While it may be reversible error for a court to exclude impeaching evidence, such as a complainant's prior inconsistent statements (*People v. Whitehead* (1966), 35 Ill. 2d 501, 221 N.E.2d 256), in the pending case the defense was in no way precluded from using the reports to impeach the officers' credibility. In *Whitehead*, the Illinois Supreme

Court held that the defense had laid a proper foundation for the impeachment of one of the State's key identification witnesses. Because the impeaching evidence could have cast doubt on a crucial trial issue, the error was considered to be prejudicial and a new trial was ordered. In the pending case, however, the jury heard all the evidence and were aware of the defense theory of the case. The prosecutor's comment that the report itself was not evidence is accurate. We do not believe that the comment on the police reports materially contributed to the jury's verdict.

For the foregoing reasons, we affirm the conviction and sentence of Edward Jones.

Affirmed.

JIGANTI, P.J., and McMORROW, J., concur.