No. 2--07--1273     Filed: 11-20-09

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07--CF--826 |
| GERMAINE ARETHA ALBERTHA ELCOCK, a/k/a Yvette Michelle Williams, | ) ) ) ) | Honorable Victoria A. Rossetti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

Following a jury trial, defendant, Germaine Aretha Albertha Elcock, a/k/a Yvette Michelle Williams,[1] was convicted of aggravated identity theft of over $100,000 (720 ILCS 5/16G--20 (West 2006)), theft of over $100,000 (720 ILCS 5/16--1(a)(1) (West 2006)), and wire fraud (720 ILCS 5/17--24(a) (West 2006)). The trial court found that the latter convictions merged into the aggravated identity theft conviction, and it sentenced defendant to 18 years' imprisonment. On appeal, defendant argues that: (1) her convictions of aggravated identify theft and theft of over

---

[1]Defendant was initially charged as Yvette Michelle Williams, but pursuant to a motion in limine, defendant requested to be called Germaine Aretha Albertha Elcock. The trial court ruled that at trial, defendant would be referred to by the name Aretha Germaine Elcock Antoine, which she had said was accurate in bond court.

$100,000 must be vacated because the victims did not have a common interest in the money; (2) her conviction of aggravated identity theft of over $100,000 must also be vacated because Illinois law does not provide for the aggregation of multiple acts of identity theft; (3) the cause must be remanded to set a schedule for the payment of restitution; and (4) the trial court improperly ordered defendant to pay fines and costs not authorized by statute. We affirm in part, reverse in part, and vacate in part and remand the cause.

## I. BACKGROUND

Defendant was charged by a seven-count information in April 2007. All counts related to the period between October 1 and December 31, 2006. Count I charged defendant with aggravated identity theft of over $100,000 (720 ILCS 5/16G--20 (West 2006)), "in that in a series of acts in furtherance of a single intention and design, [she] knowingly used the personal identifying information of Janet Stein and Charlotte Weidman, being their names, to fraudulently obtain $116,053.37 in the names of" Stein and Weidman. Count I also alleged that Stein and Weidman were over 60 years old. Count II charged defendant with aggravated identity theft of between $10,000 and $100,000 (720 ILCS 5/16G--20 (West 2006)) for using Stein's name to fraudulently obtain $45,000. Count III charged defendant with aggravated identity theft of between $10,000 and $100,000 for using Stein's social security number to fraudulently obtain $45,000. Count IV charged defendant with aggravated identity theft of between $10,000 and $100,000 for using Weidman's name to fraudulently obtain $71,053.37 credit. Count V charged defendant with aggravated identity theft of between $10,000 and $100,000 for using Weidman's social security number to fraudulently obtain $71,053.37 credit. Count VI charged defendant with theft of over $100,000 (720 ILCS 5/16--(a)(1) (West 2006)) in that she, "in a series of acts in furtherance of a single intention and

design, knowingly exerted unauthorized control over the property of Janet Stein and Charlotte Wiedman [sic], being United States Currency having a total value in excess of $100,000," intending to permanently deprive them of the money. Count VII charged defendant with wire fraud (720 ILCS 5/17--24(a) (West 2006)) for using electronic impulses received by a person in Illinois in furtherance of a scheme to obtain money through false representations.

On August 17, 2007, defendant filed motions to suppress statements and other evidence. Following a hearing, the trial court denied the motions on August 24, 2007.

Defendant's trial took place from October 10, 2007, to October 12, 2007. Stein testified as follows. She was 74 years old and retired. She lived at 830 Audobon Way in Lincolnshire but spent about five months out of the year in Florida. In November 2006, when she was in Florida, she received two unusual phone calls: one from a woman claiming to be from AT&T, her telephone service provider in Illinois, and one from a woman claiming to be from the United States Treasury Department. In response to the first call, Stein told the woman that she did not understand why she was calling. In response to the second call, Stein provided her driver's license number and confirmed that her daughter's name was Cindy Miller and that she was getting social security checks for a specific amount. On November 15, 2006, she received a call from a woman claiming to be from American Airlines. Stein was scheduled to fly to Illinois on November 19. Following the phone call, Stein called the airlines three times. The first time, her reservation was fine; the second time, she learned that it had been changed; and the third time, she learned that her reservation had been cancelled. Stein had never changed or cancelled her flight.

After finding out that someone had cancelled her flight, Stein asked her daughter to check on her checking and savings accounts with J.P. Morgan Chase (Chase), which were also in her

daughter's name. Stein learned that money was missing, so she closed the accounts when she returned to Illinois. Stein never had an account with Fidelity Investments. She did not authorize three transfers of $15,000 from her Chase accounts to an account with Fidelity. Stein did not use the Internet for online banking, and she had never been to Fayetteville, North Carolina. She was not the person in photographs taken by ATM surveillance cameras in Fayetteville, and the signature on a Chili's receipt was not hers. She also never requested any Green Dot debit or credit cards, but she received two in the mail at her Lincolnshire address, one in her name and the other with the name Belinda French. Stein did not know anyone named Belinda French. Stein agreed that her Chase account was eventually credited back with the amount of the missing money.

Weidman provided the following testimony. She was 81 years old and retired. From October to December 2006, she was living in an apartment in a retirement community at 830 Audobon in Lincolnshire. On November 13, 2006, she received an unusual phone call from a woman saying she was from the "office of the bureau of highway license." The woman called a second time in a matter of minutes. In response to the conversation, Weidman said that she was going to call the Secretary of State's office to make sure that her driver's license was valid. Also, Weidman normally received mail on a daily basis, but she did not receive any mail on November 15 or 16 despite the fact that she had not put a hold on her mail.

On December 12, 2006, Weidman received a Green Dot debit card in the mail with her name on it. She had never requested the card, so she called and cancelled it. The same day, she received a call from Glen Tierney of Fidelity Investments. Weidman had a mutual fund account with Fidelity. In October and November 2006, she had a balance of about $70,000. She did not open any new accounts through Fidelity, ask Fidelity to change her e-mail or mailing address, or give anyone

permission to access her account. Weidman also did not do any online banking. Weidman was able to withdraw all of the money in her Fidelity account and did not suffer any financial loss.

Glen Tierney provided the following testimony. He investigated financial crimes committed by or against accounts for Fidelity Investments. On November 21, 2006, he was assigned to investigate a complaint made by Stein that a Fidelity brokerage account was established without her authorization. Tierney determined that the account was set up on the Internet on October 19, 2006. On October 31, 2006, the legal address on the account was changed from 830 Audobon Way in Lincolnshire to 856 Orange Street in Fayetteville. Three transfers of $15,000 each were electronically made to the account from a Chase account in November 2006. A "gold check card" was issued to the account on November 7, 2006. Between November 17 and November 21, 2006, the card was used in and around Fayetteville at ATMs, a Chili's restaurant, a Wal-Mart, and post offices. In total, $28,408.19 was withdrawn from the Fidelity account in Stein's name.

Tierney further determined that the same computer used to access Stein's account had accessed Weidman's account. Weidman had a preexisting mutual fund account with Fidelity with about $71,000 in it, but a second, brokerage account had been opened in her name. The brokerage account did not have any money in it or transactions associated with it, and Tierney put a restriction on Weidman's mutual fund account to prevent the disbursement of funds until Weidman was contacted. Tierney explained that the person who had opened the brokerage account would have also been able to access the mutual fund account.

David Oakley, a United States postal inspector, testified that he inspected crimes using the post office or against the post office. His territory was the southeastern part of North Carolina. Oakley became involved in this investigation in December 2006 after he learned about a possible

identity theft and contacted Tierney of Fidelity Investments. Oakley discovered that a debit card account had been opened up in the victim's name and used throughout the Fayetteville area in certain transactions, including at a Wal-Mart and a Chili's restaurant. Oakley was able to obtain the original Chili's receipt, and it had the name "J. Stein" on it. The debit card had also been used to purchase money orders at five post offices in and around Fayetteville. Oakley explained that money orders of less than $3,000 do not require identification, but the buyer must list his name and address. The money orders at issue here had the name of Belinda French as the buyer, but they had different addresses listed. Some of the addresses did not exist, and one of the addresses was for a house in a transient type of neighborhood. The debit card had also been used at an ATM in Fayetteville, and Oakley was able to obtain photographs from the ATM's surveillance camera.

Oakley checked the department of motor vehicles and learned that it had a picture associated with the name Belinda French, as well as an address of 112 Weatherstone. Oakley talked with the manager of the apartment complex at that address and showed her the picture of French. Oakley then told the Fayetteville and Lincolnshire police departments that he believed their suspect was living there.

Denise Hall testified that she was the property manager of the apartment complex at 112 Weatherstone Drive. Apartment 203 was leased beginning on October 25, 2005, under the name of Cecilia Antoine; the person renting the apartment had provided a New York identification card with that name. However, Hall had seen only defendant accessing the apartment from October 2005 to March 2007 and had never seen the person pictured on the Cecilia Antoine identification card.

Officer Adam Hyde of the Village of Lincolnshire testified as follows. In late 2006 he began an investigation involving Stein and Weidman. Both women lived in Sedgebrook, a community for

the elderly located in Lincolnshire. Postal inspector Oakley and Fidelity investigator Tierney were also involved in the investigation. Hyde was present when an arrest warrant was executed at apartment 203 on March 12, 2007. Defendant opened the door and allowed the officers inside. Hyde asked what her name was, and she said "uh" five times before saying Aretha. Hyde asked who lived with her in the apartment, and defendant said her mother Cecilia had just left. Hyde said that a detective had been watching the apartment the entire morning, and no one came or left. Defendant nodded and said she lived alone.

The police collected numerous items from the apartment, including a laptop computer, a fax machine, a laser printer, cards, and many documents. Hyde identified Green Dot debit cards and MoneyPak cards; four cell phones; a North Carolina identification card with the name Belinda French; Green Dot debit cards in the names of Aretha Antoine and Cecilia Antoine; a Bally's fitness card with defendant's picture and the name Yvette Williams; bank cards in the name of Cecilia Antoine; an insurance card with the name Germaine Alcock; transaction receipts for Western Union money orders; post office receipts for money orders; a receipt for "the Millionaire Club" in the name of Yvette Williams; a Best Buy Geek Squad repair order in the name of Belinda French; a work identification card in the name of Cecilia Antoine; a copy of a New York driver's license and a social security card for Cecilia Antoine; a St. Lucia birth certificate in the name of Germaine Aretha Alberta; and a fax transmission for Cecilia Antoine from Wachovia bank. The police further found handwritten notes about retirement communities across the country and numerous entries of birthdays and social security numbers associated with the names Yolanda French, Belinda French, and Antoine. The police also found new Ipods, DVD players, and purses. One of the cell phones found had been assigned the same 847 number that had called the women in Lincolnshire.

Officer Hyde additionally testified that at a court proceeding on March 24, 2007, a judge placed defendant under oath and asked her name, her address, and whether she lived with anyone. Defendant replied that her name was Aretha Germaine Alcock Antoine and that she lived alone at 112 Weatherstone, apartment 203, in Fayetteville.

Cristi Smith, manager of risk management for the Green Dot Corporation, testified as follows. Greed Dot issues personalized prepaid Visa and Master Card cards. They are not credit cards, because there is no line of credit issued, and they differ from typical debit cards because they are not linked to a checking account. Instead, money must be preloaded on the card, and the card may then be reloaded. To obtain a card, a customer would have to purchase an activation card at a retailer, pay a fee and a minimum amount to get the card, and then either go online or call to activate the card. Green Dot requires the customer to provide his name, birthday, social security number, address, and phone number. The company verifies the information with a credit bureau, and the customer receives a card number. Green Dot will then mail a personalized card with the account number to the customer.

Smith identified the cards received by Stein and Weidman as Green Dot cards. The card sent to Stein was activated on October 25, 2006, with $25. Belinda French was listed as the primary account holder and Janet Stein was added as a secondary card holder. The address was changed after the card was activated, and a replacement card in the name of Janet Stein was requested on October 30, 2006. Account records for the card sent to Weidman listed Weidman as the primary card holder, with her street address. The card was activated online on November 18, 2006, with $50. The account had address changes made online and with a representative.

Smith identified additional records for Green Dot cards found in defendant's apartment. They had the name Belinda French and a Connecticut address; Cecilia Antoine and the Weatherstone Drive address; Aretha Antoine and a different Fayetteville address; Belinda French and a third Fayetteville address; and Belinda French with a fourth Fayetteville address.

The jury was instructed that if it found defendant guilty of aggravated identity theft of more than $100,000 as well as aggravated identity theft of between $10,000 and $100,000 as to Stein and Weidman, it should sign only the verdict form for aggravated identity theft of more than $100,000 and return unsigned the verdict forms for aggravated identity theft of between $10,000 and $100,000. The jury did so, and it additionally found defendant guilty of theft of more than $100,000 and wire fraud.

On December 3, 2007, the trial court denied defendant's motion for a new trial. It entered judgment on all counts and found that they merged into count I of aggravated identity theft of over $100,000. The trial court sentenced defendant to 18 years' imprisonment and ordered her to pay $28,408.19 in restitution to Fidelity Investments. It further ordered her to pay $790 to the State. Defendant timely appealed.

## II. ANALYSIS

Defendant first argues that her convictions of aggravated identity theft of over $100,000 and theft of over $100,000 must be vacated because the State failed to allege or prove that Stein and Weidman had a common interest in the money and credit, as required by section 111--4(c) of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure or Code) (725 ILCS 5/111--4(c) (West 2006)). Defendant further argues that the conviction of aggravated identity theft of over

$100,000 should be vacated on the additional ground that section 111--4(c) does not permit the joinder of multiple acts of identity theft.

We begin by addressing defendant's argument that her conviction of aggravated identity theft of over $100,000 must be vacated because section 111--4(c) does not permit the joinder of multiple acts of identity theft. Specifically, defendant argues that the State improperly added the $45,000 and $71,053.37 in money and credit fraudulently obtained from Stein and Weidman in order to charge her with the Class X felony of aggravated identity theft of over $100,000. Defendant did not raise this issue in the trial court, and the State notes that the issue of improper joinder of offenses may be forfeited. See People v. Johnson, 231 Ill. App. 3d 412, 424 (1992). However, here defendant does not dispute the joinder of multiple offenses, but rather argues that the State lacked the statutory authority to combine multiple acts of identity theft into a single offense. A conviction or sentence that fails to conform to statutory requirements is void and may be challenged by the defendant at any time (People v. Maldonado, 386 Ill. App. 3d 964, 967 (2008)), so defendant has not forfeited her argument. Whether section 111--4(c) allows the State to aggregate multiple acts of identity theft raises a question of statutory interpretation, which we review de novo. People v. Caballero, 228 Ill. 2d 79, 82 (2008).

Section 111--4(c) provides, in relevant part:

"Two or more acts or transactions in violation of any provision or provisions of Sections 8A--2, 8A--3, 8A--4, 8A--4A and 8A--5 of the Illinois Public Aid Code, Sections 16--1, 16--2, 16--3, 16--5, 16--7, 16--8, 16--10, 16A--3, 16B--2, 16C--2, 17--1, 17--6, 17--7, 17--8, 17--9 or 17--10 of the Criminal Code of 1961 and Section 118 of Division I of the Criminal Jurisprudence Act, may be charged as a single offense in a single count of the same

indictment, information or complaint, if such acts or transactions by one or more defendants are in furtherance of a single intention and design and if the property, labor or services obtained are of the same person or are of several persons having a common interest in such property, labor or services." 725 ILCS 5/111--4(c) (West 2006).

Neither aggravated identity theft (720 ILCS 5/16G--20 (West 2006)) nor identity theft (720 ILCS 5/16G--15 (West 2006)) is included in the list of offenses for which two or more acts or transactions may be charged as a single offense.

The State acknowledges that section 111--4(c) does not pertain to identity theft offenses, but it argues that common-law authority continues to exist for considering multiple acts of identity theft to constitute one offense. The State cites People v. Barrett, 405 Ill. 188 (1950), where the defendant, a trustee, embezzled the money of 5 named individuals and 2,500 other unpaid holders of liquidating certificates. Barrett, 405 Ill. at 193. The supreme court stated that duplicity in an indictment comes from charging more than one offense in a single count and not from pleading different acts contributing to the ultimate charged offense. Barrett, 405 Ill. at 194. The court held that the acts of embezzlement were properly joined because they arose from one transaction, and it noted that embezzlement often consists of many acts done over a period of months or years. Barrett, 405 Ill. at 194. The State also cites Woods v. People, 222 Ill. 293 (1906), where the defendant was convicted of grand larceny for stealing natural gas. The defendant argued that he was guilty of larceny rather than grand larceny because there was no evidence that the value of the gas he converted to his own use at any one time exceeded the threshold amount for grand larceny. Woods, 222 Ill. at 299-300. The supreme court disagreed, holding that the jury could properly find that there

was one continuous taking over a period of days exceeding the threshold value for grand larceny, thereby constituting one offense. Woods, 222 Ill. at 300-02.

The State argues that defendant's conviction of aggravated identity theft of over $100,000 should be deemed to involve a single transaction consisting of multiple acts as in Barrett, or one continuous act as in Woods. The State's argument is without merit. Unlike in Woods, defendant's alleged conduct was not one continuous taking from a single victim, but rather a series of acts directed against two different victims. Barrett is not helpful to the State's position, because the question here is not whether any acts may be combined to constitute one offense, but rather whether acts of identity theft may be combined. Section 111--4(c) does not allow for acts to be combined for charges of identity theft, and the cases cited by the State do not even involve identity theft and thereby do not supply any common-law authority for charging multiple acts of identity theft as a single offense. Moreover, even if such a common-law case existed, it is doubtful whether it could trump section 111--4(c), as the Code of Criminal Procedure states that its "provisions shall govern the procedure in the courts of Illinois in all criminal proceedings except where provision for a different procedure is specifically provided by law." 725 ILCS 5/100--2 (West 2006). The committee comments of the quoted statute defining the scope of the Code further clarify that the procedure in the Code will govern unless another Illinois statute provides a different procedure in a particular situation, and that common-law practice or prior statutes should be considered only in order to provide the statutes in the Code with a reasonable construction. 725 ILCS Ann. 5/100--2, Committee Comments--1963, at 6 (Smith-Hurd 2006); see also 720 ILCS 5/1--3 (West 2006) ("No conduct constitutes an offense unless it is described as an offense in this Code or in another statute of this State"); cf. People v. Muzzarelli, 331 Ill. App. 3d 118, 121 (2002) (courts cannot impose a

common-law definition over a statutory definition). Thus, section 111--4(c) does not allow multiple acts of identity theft to be combined into one offense, and the State has not cited any valid authority that would have allowed it to do so.

Defendant further argues that her conviction of aggravated identity theft of over $100,000 must be vacated for the additional reason that the State failed to allege or prove that Stein and Weidman had a common interest in the money and credit. Defendant also cites the lack of a common interest in the money and credit as a basis to vacate her conviction of theft of over $100,000.

Defendant similarly failed to raise these issues in the trial court. However, while an alleged deficiency in a charging instrument that is not challenged before trial requires the defendant to show that he was prejudiced in the preparation of his defense (People v. Rowell, 229 Ill. 2d 82, 93 (2008)), here defendant also argues that the State failed to prove that Stein and Weidman had a common interest in the money and credit. In this manner, defendant is attacking the sufficiency of the evidence, and a defendant need not raise this issue in a posttrial motion to preserve it for appellate review. People v. Enoch, 122 Ill. 2d 176, 190 (1988).

The standard of review for a claim of insufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89 (1979); People v. Collins, 106 Ill. 2d 237, 261 (1985). Defendant points out that section 111--4(c) states that "[t]wo or more acts or transactions *** may be charged as a single offense *** if such acts or transactions by one or more defendants are in furtherance of a single intention and design and if the property, labor or services obtained are

of the same person or are of several persons having a common interest in such property, labor or services." (Emphasis added.) 725 ILCS 5/111--4(c) (West 2006). Thus, in order to aggregate the money and credit taken from Stein and Weidman and convict defendant of theft of over $100,000 and aggravated identity theft of over $100,000, the State was required to prove "a common interest" in the money and credit. Cf. Rowell, 229 Ill. 2d at 100 (in order to aggregate value of thefts to prove a felony, the State had to prove that the thefts were in furtherance of a single intention and design under section 111--4(c)); see also People v. Adams, 26 Ill. App. 3d 324, 326 (1975) (the State could not aggregate various misdemeanor offenses against different companies into a single felony offense without alleging that the companies had a common interest in the stolen property).

The State acknowledges that Stein and Weidman did not have a common interest in the money and credit. However, the State argues that the evidence shows that defendant caused $45,000 to be transferred into a Fidelity account that she fraudulently created in Stein's name, and that she later gained access to over $71,000 in Fidelity funds in Weidman's existing account by fraudulently creating a new account in Weidman's name. In this manner, the State argues, defendant used the names of Stein and Weidman to defraud Fidelity of money and credit. At oral argument, the State referred to Fidelity as the "common victim" of the identity theft, in that defendant obtained the money and credit from Fidelity and was ordered to pay restitution to it.

There are several problems with the State's argument. First, regarding the charge of theft of over $100,000, defendant was alleged to have "knowingly exerted unauthorized control over the property of" Stein and Weidman, not Fidelity. The jury instructions for this charge stated that the State had to prove, as a first proposition, that Stein "was the owner of the property in question," and as a second proposition, that Weidman "was the owner of the property in question." Thus, the State

clearly named Stein and Weidman as the owners of the money and credit for this charge, yet, as the State acknowledges on appeal, the two women did not have a common interest in the money and credit. Because the State did not prove that Stein and Weidman had such a common interest, as required to aggregate the value of the property under section 111--4(c), defendant was not proven guilty of theft of over $100,000 beyond a reasonable doubt.

Regarding the charge of aggravated identity theft of over $100,000, it is clear from the record that the State's position at trial was that the money and credit belonged to Stein and Weidman. In addition to the fact that the funds were alleged to have belonged to the women for the theft of over $100,000 charge, the State even stated in closing argument that "[t]here has been uncontroverted testimony from [Stein and Weidman] that that *** was their money." Moreover, the State never alleged in the indictment that Fidelity was the victim of the identity theft or theft. Indeed, the indictment did not name Fidelity at all. See People v. Wayman, 379 Ill. App. 3d 1043, 1059 (2008) (the State is obligated to prove the defendant guilty of the crime charged rather than an uncharged violation of the same statute). The jury instructions for this charge also did not name Fidelity or require the jury to find a common interest in the money and credit.

The failure to name Fidelity was not just a deficiency in the charging instrument and jury instructions, because at trial there was insufficient evidence presented that Fidelity had a common interest in the money and credit. We recognize that the evidence showed that defendant used Fidelity to set up and/or access the accounts in the names of Stein and Weidman. However, even if, arguendo, the money defendant withdrew from Stein's account legally belonged to Fidelity (see Pope v. First of America, N.A., 298 Ill. App. 3d 565, 569 (1998) ("When a general deposit is made, the bank becomes a debtor of the depositor and has no obligation to set aside the deposited funds")),

there was no evidence that the credit defendant illegally obtained access to in Weidman's name belonged to Fidelity rather than Weidman. In other words, if the State's position on appeal is that the actual money in the Fidelity accounts at issue belonged to Fidelity rather than Stein and Weidman, the logical corollary is that the credit to the $71,053.37 in Weidman's mutual fund account belonged to Weidman. If that is true, Fidelity did not have a common interest in the money and credit, and the individual amounts stolen fall short of the $100,000 threshold. Although defendant may have obtained access to the money and credit from Stein and Weidman in the same manner, this would support only section 111--4(c)'s requirement that defendant acted "in furtherance of a single intention and design" and not its requirement that the victim or victims have "a common interest" in the property. Thus, there was insufficient evidence to prove, beyond a reasonable doubt, the "common interest" element of aggravated identity theft of over $100,000 as charged, requiring reversal of this conviction as well.

In summary, section 111--4(c) does not allow multiple acts of identity theft to be combined into one offense, so the State lacked the statutory authority to combine acts of identity theft against Stein and Weidman into a single count of aggravated identity theft of more than $100,000. Correspondingly, the trial court lacked the authority to enter a conviction, and the conviction is void. See People v. Rodriguez, 355 Ill. App. 3d 290, 296 (2005) (the law and the circumstances of the case limit a court's power to render a particular judgment, and where the court acts beyond such power, it is a jurisdictional failure that renders the judgment void). Moreover, the State also failed to prove defendant guilty of aggravated identity theft of over $100,000 and theft of over $100,000 beyond a reasonable doubt, because there was insufficient evidence of a common interest in the money and

credit as required by section 111--4(c). We therefore reverse defendant's convictions of aggravated identity theft of more than $100,000 and theft of more than $100,000.

Defendant acknowledges that the evidence was "arguably sufficient" to prove that she was guilty of aggravated identity theft of between $10,000 and $100,000 as to Stein and Weidman individually. Defendant further acknowledges that by following the trial court's instructions and signing the verdict form finding her guilty of aggravated identity theft of more than $100,000 while returning unsigned the verdict forms for the charges of aggravated identity theft of between $10,000 and $100,000, the jury found her guilty of the lesser charges of aggravated identity theft. Accordingly, we affirm defendant's remaining convictions and remand the cause for resentencing.

Defendant next argues that the case must be remanded to set a payment schedule for the $28,408.19 in restitution she was ordered to pay Fidelity. Regarding restitution, section 5--5--6(f) of the Unified Code of Corrections provides:

"(f) Taking into consideration the ability of the defendant to pay, including any real or personal property or any other assets of the defendant, the court shall determine whether restitution shall be paid in a single payment or in installments, and shall fix a period of time not in excess of 5 years or the period of time specified in subsection (f--1), not including periods of incarceration, within which payment of restitution is to be paid in full. Complete restitution shall be paid in as short a time period as possible. However, if the court deems it necessary and in the best interest of the victim, the court may extend beyond 5 years the period of time within which the payment of restitution is to be paid. If the defendant is ordered to pay restitution and the court orders that restitution is to be paid over a period greater than 6 months, the court shall order that the defendant make monthly payments; the

court may waive this requirement of monthly payments only if there is a specific finding of good cause for waiver." 730 ILCS 5/5--5--6(f) (West 2006).

Defendant does not contest the amount of restitution but argues that neither the trial court's oral pronouncement nor the written restitution order provides any guidance as to how she must pay the restitution. Defendant cites several cases where the cause was remanded so that the trial court could determine the time and manner of the payment of restitution, taking into account the defendant's financial situation. See People v. Fontana, 251 Ill. App. 3d 694, 708-09 (1993); People v. Fuzz, 218 Ill. App. 3d 418, 422-23 (1991). Defendant also points out that this court recently stated, "If the court does not specify a particular time [for the payment of restitution], the restitution order is fatally incomplete." In re Estate of Yucis, 382 Ill. App. 3d 1062, 1067 (2008). However, the State argues that a remand on this issue is not necessary and cites cases holding that, under the circumstances of the case, the trial court was not required to specify the manner and method of payment. See People v. Brooks, 158 Ill. 2d 260, 263 (1994); People v. Tynes, 259 Ill. App. 3d 307, 308 (1994). Here, we need not resolve the inconsistencies, if any, in the aforementioned cases, as we are already remanding the case for resentencing. At that hearing, the trial court is directed to set a payment schedule for restitution.

Last, defendant argues that the trial court improperly entered judgment for fines and costs that are not authorized by statute. Defendant notes that the trial court ordered her to pay $790 to the State. She argues that of this amount, the following charges were not authorized by law: $250 for the services of the public defender; $10 for "arrestee's medical costs"; $10 for mental health court; and $140 under the Violent Crime Victims Assistance Act (725 ILCS 240/10 (West 2006)). The propriety of court-ordered fines and fees presents a question of statutory interpretation, which we

review de novo. People v. Price, 375 Ill. App. 3d 684, 697 (2007). The primary rule of statutory construction is to ascertain and give effect to the legislature's intent, which is best determined by the statutory language's plain and ordinary meaning. People v. Jamison, 229 Ill. 2d 184, 188 (2008).

Regarding the $250 fee for the services of the public defender, defendant notes that section 113--3.1(a) of the Code of Criminal Procedure (725 ILCS 5/113--3.1(a) (West 2006)) requires notice and a hearing to determine a defendant's ability to pay before the imposition of such a fee. See People v. Love, 177 Ill. 2d 550, 555 (1997) (section 113--3.1(a) "clearly requires the trial court to conduct a hearing into the defendant's financial resources as a precondition to ordering reimbursement"); People v. Barbosa, 365 Ill. App. 3d 297, 301 (2006) (a defendant must be given notice of the hearing and an opportunity to present evidence regarding his ability to pay). The State concedes error on this issue. Accordingly, we vacate the portion of the sentencing order imposing the $250 public defender fee and remand the case for a hearing pursuant to section 113--3.1(a). See Love, 177 Ill. 2d at 565.

Defendant next argues that the $10 arrestee's medical fee was improper because there was no evidence that she suffered any injury during her arrest or while in the custody of the Lake County jail. Section 17 of the County Jail Act states that the "county shall be entitled to a $10 fee for each conviction or order of supervision for a criminal violation, other than a petty offense or business offense." 730 ILCS 125/17 (West 2006). Defendant points out that the fees are to be "taxed as costs," "deposited by the county in a fund to be established and known as the Arrestee's Medical Costs Fund," and "used solely for reimbursement of costs for medical expenses relating to the arrestee while he or she is in the custody of the sheriff and administration of the Fund." 730 ILCS 125/17 (West 2006). Further, the statute defines "medical expenses relating to the arrestee" as "only

those expenses incurred for medical care or treatment provided to an arrestee on account of an injury suffered by the arrestee during the course of his or her arrest unless such injury is self-inflicted." 730 ILCS 125/17 (West 2006). Therefore, according to defendant, the plain language of the statute does not allow the imposition of this fee on all persons who are convicted of offenses, but rather only on individuals who were injured during the course of their arrests. Defendant emphasizes that the statute uses the language "the arrestee" and "his or her arrest" in the singular, which she argues implies that the fee was not meant as a general fee to cover costs for all arrestees' injuries.

As we recently held in People v. Evangelista, 393 Ill. App. 3d 395, 399-400 (2009), defendant's argument is without merit. While the money collected under section 17 may be limited to pay for medical expenses incurred during the course of arrests, the $10 fee can be imposed "for each conviction or order of supervision for a criminal violation." (Emphases added.) 730 ILCS 125/17 (West 2006); see also People v. Dowding, 388 Ill. App. 3d 936, 950 (2009) ("One of the ways that medical expenses are funded is through the collection of a $10 fee from each offender convicted of a 'criminal violation' "). The specific language imposing the fee shows that it is not limited to defendants who were injured during the course of their arrests. As the State points out, this statutory scheme, which requires all convicted defendants to contribute to the fund, with the fund reimbursing the county, apparently exists because an arrestee is required to reimburse the county only to the extent that he or she "is reasonably able to pay for that care" (730 ILCS 125/17 (West 2006)), leaving the fund to pay for the balance. Accordingly, we affirm the $10 arrestee's medical charge.[2]

---

[2]We note that the arrestee's medical costs fee is not covered by presentencing custody credit. 730 ILCS 125/17 (West 2006).

Defendant further argues that the $10 mental health court fee must be vacated. Defendant notes that while the charge is statutorily referred to as a "fee" (55 ILCS 5/5--1101(d--5) (West 2006)), the appellate court has held that it is actually a fine (People v. Paige, 378 Ill. App. 3d 95, 102 (2007)). Defendant argues that, because the trial court did not order her to pay any fines, the $10 charge must be vacated. However, as the State points out, the trial court entered judgment in its favor for $790, which included $10 for the mental health court charge. See also Price, 375 Ill. App. 3d at 701 (once the county board enacts an ordinance imposing a mental health court fine, the fine is mandatory). Defendant alternatively requests a $5-per-day credit for the 266 days she spent in custody prior to sentencing. See 725 ILCS 5/110--14 (West 2006) (providing for a $5-per-day credit for any person who is incarcerated on a bailable offense but does not pay bail). The State concedes that she is entitled to this credit against the fine.

Last, defendant argues that her $140 fine under the Violent Crimes Victims Assistance Act (Act) must be reduced. The State concedes that this fine exceeds the amount authorized by statute. The Act provides that where a defendant is assessed fines, he must also pay "an additional penalty of $4 for each $40, or fraction thereof, of fine imposed." 725 ILCS 240/10(b) (West 2006). Here, defendant was assessed a $10 mental health court fine, and even if the $10 arrestee's medical charge were considered a fine, defendant is still within the $40 limit for which a penalty of $4 is assessed. Accordingly, defendant's fine under the Act should be reduced to $4.[3]

## III. CONCLUSION

---

[3]We also note that this fine is not covered by presentencing custody credit. 725 ILCS 240/10(b) (West 2006).

For the foregoing reasons, we reverse defendant's convictions of aggravated identity theft of over $100,000 and theft of over $100,000. We affirm defendant's remaining convictions and remand the case for resentencing. The circuit court of Lake County is also directed to set a payment schedule for restitution. We vacate the $250 public defender's fee and further direct the circuit court to hold a hearing to determine defendant's ability to pay such a fee. We affirm the $10 arrestee's medical fee and the $10 mental health court charge, though we also direct the circuit court to modify the sentencing order to reflect defendant's presentencing credit toward the latter charge. Finally, we vacate the $140 fine under the Act and direct the circuit court to instead impose a $4 fine.

Affirmed in part, reversed in part, and vacated in part; cause remanded with directions.

ZENOFF, P.J., and O'MALLEY, J., concur.