NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 190694-U

NO. 4-19-0694

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 20, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Champaign County |
| ANGELIA J. GANT, | ) | No. 18CM985 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Brett N. Olmstead, |
| | ) | Judge Presiding. |

---

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Knecht and Justice Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Because defense counsel agreed to a demonstration firing of a stun gun in the jury trial, defendant has forfeited his claim, on appeal, that the circuit court erred by allowing the demonstration firing.

(2) The circuit court did not abuse its discretion by allowing a cell phone video, with the hearsay edited out, to be played to the jury.

¶ 2    In the Champaign County circuit court, a jury found defendant, Angelia J. Gant, guilty of aggravated assault (720 ILCS 5/12-2(a) (West 2018)) and unlawful use of a weapon, namely, a stun gun (*id.* § 24-1(a)(2)). For those Class A misdemeanors, the court sentenced her to 18 months of probation, 90 days in the Champaign County correctional center, and 150 hours of public service. Defendant appeals on two grounds.

¶ 3          First, defendant contends that the circuit court erred by allowing the stun gun to be discharged in open court, in front of the jury. Because defense counsel agreed to the demonstration firing of the stun gun, this contention is forfeited.

¶ 4          Second, defendant claims the circuit court erred by allowing the State to play for the jury an edited cell phone video of part of the confrontation between defendant and the victim, Thomas Wodetzki. We find no abuse of discretion in the court's overruling of the "speculation" objection to this edited video. All other theories of inadmissibility are forfeited.

¶ 5          Therefore, we affirm the judgment.

¶ 6                              I. BACKGROUND

¶ 7          The evidence in the jury trial tended to show that on October 10, 2018, around 9:45 a.m., defendant was in a McDonald's drive-through in Urbana, Illinois, when she emptied the ashtray of her SUV onto the pavement of the drive-through. Thomas Wodetzki, who was in a gray car behind her vehicle, saw her dump out the cigarette butts and ashes. He got out of his car and walked up to defendant's SUV. Her window was down, and he pointed out to her that some 16-year-old kid making minimum wage would have to clean up her mess. Her only reply was to ask him, " ['D]o you own that[?'] " Puzzled by this reply, he got back in his car.

¶ 8          When defendant pulled up to the payment window, she turned her steering wheel to the right so as to make room for her to open her driver's-side door. Then she got out of her SUV and began walking toward Wodetzki's car, yelling at him, calling him names, and urging him to come out. At defendant's approach, Wodetzki rolled up his car window, locked his door, and "kind of froze in fear." The prosecutor asked him:

> "Q. Did you feel like that was what would happen?
>
> A. I did once she got close and I saw what was in her hand.

Q. And what was in her hand?

A. It's what I call a stun gun. It's a device that has two prongs and it arcs electricity. It makes a very loud noise. It's a little scary.

Q. What drew your attention to the stun gun?

A. The fact that it was ten inches from my head and she had hit my glass with it and was pulling the trigger.

Q. And when you said pulling the trigger what do you mean by that?

A. Activating the electricity so that if it were to touch me it would render me unconscious or whatever.

Q. And when she activates the stun gun next to your window the Defendant then banged on your window?

A. With the device.

Q. How many times do you think that she did that?

A. Two or three.

Q. And how many times do you think the stun gun was activated?

A. It seemed like it was continuously activated, but I imagine she had to pull the trigger a couple times. But to me it seemed continuous.

* * *

Q. Can you describe to the jury the sound of the stun gun activating?

A. I think the closest thing I can come up with is if you've ever heard a transformer blow in your neighborhood maybe after a storm. It's that kind of crackling, loud, electrical sound, and that's the best way I can describe it.

Q. And were you able to see any kind of light or electricity emitting from the stun gun?

A. I was on a number of occasions because she not only held it next to my head but as she walked away from my car she continued to activate the stun gun all the way up to the point where she got in her vehicle, drove forward, got her food and as she sat at the food window continued to activate that device and continued to yell at me as she did it."

¶ 9 Matthew Wease, who was the driver of a van immediately behind Wodetzki, saw this incident. Wease was in his work van, which sat high off the ground. He saw Wodetzki approach the SUV after defendant dumped her ashtray on the driveway. He saw Wodetzki mildly address defendant and then return to his car and get back in. Then defendant got out of her SUV and strode up to Wodetzki's car, yelling and calling Wodetzki a "bitch." She hit the driver's side window with the loudly crackling stun gun. Wease saw the electrical arc of the stun gun, and the sound of the stun gun going off was, to him, impressive and intimidating. As defendant was on her way back to her SUV, hurling parting insults at Wodetzki, Wease's passenger (who appears to be unnamed) began video-recording her with his cell phone.

¶ 10 In the unedited video footage (People's exhibit No. 1), defendant is standing between Wodetzki's gray car and her red SUV, and she is yelling at the gray car. She then bends to the ground before returning to the driver's seat of her SUV. As defendant receives her food from the window of the McDonald's, the passenger in Wease's van remarks, "I hadn't even finished ordering. Are you kidding me? Tasers are illegal in Illinois, too." (Sometimes, in the record and in the briefs, the electroshock weapon in question is referred to as a "Taser." The correct term, however, is "stun gun." A Taser is different in that it fires darts that remain attached to the Taser

by electrical wires, whereas a stun gun has the electrodes mounted permanently on the front.) As the passenger in the video says "in Illinois, too," the stun gun can be heard crackling, and a light can be seen in the SUV's left side mirror. Someone in Wease's van then says, "She ain't f*** around, though. You need to call the cops."

¶ 11 In response to defense counsel's hearsay objection, the prosecutor edited out the two statements that were made in the video except that the prosecutor left in the words "in Illinois, too," because cutting out those words also would have cut out the sound of the stun gun being discharged. The two deletions resulted in skips in the video. Defense counsel objected to the edited video (People's exhibit No. 1A) on the ground that the jury would infer, from the skips, that material unfavorable to defendant had been cut out. The circuit court overruled the objection, concluding that although the edited video was imperfect, the deletions were reasonable means of alleviating defendant's hearsay concerns while allowing the jury to hear the probative sound of the stun gun being activated by defendant.

¶ 12 Soon after the incident at McDonald's, the police recovered the stun gun from defendant's car. In the jury trial, the prosecutor proposed having a sergeant with the Urbana police department, Andrew Hewkin, discharge the stun gun (People's exhibit No. 2) in the jury's presence so that the jurors could hear, in person, the sound of the stun gun. Also, the prosecutor proposed having Hewkin, in his testimony, compare the strength of the electrical arc now to its strength when Hewkin originally tested the stun gun—the point being that the battery had run down somewhat. Defense counsel responded that he had no objection to a demonstration firing of the stun gun. On the ground of speculation, however, he objected to having Hewkin compare the present strength of the stun gun to its past strength. The circuit court overruled the objection.

¶ 13 II. ANALYSIS

¶ 14                    A. The Demonstration Firing of the Stun Gun

¶ 15          In the statement of facts in her brief, defendant represents that, in the jury trial, "counsel agreed to allow the State to fire the Taser, *as long as* Hewkin could not testify about the level and strength compared to the previous test, as that would be speculation." (Emphasis added.) Thus, in defendant's telling, defense counsel only *conditionally* agreed to the State's demonstration firing of the stun gun. According to defendant, defense counsel agreed that Hewkin should be allowed to fire the stun gun in the jury's presence *provided that*, in his testimony, he did not compare the strength of the electrical discharge now to its strength in a previous test. (By "firing" the stun gun, we mean pushing a button on the stun gun and thereby causing electricity to arc between the two metal probes on the front of the stun gun.)

¶ 16          Actually, defense counsel's agreement to the demonstration firing of the stun gun was unconditional. Defense counsel told the circuit court:

          "MR. ANDERSON: Your Honor, if—if the State would like to fire off this Taser that's fine. I would only ask essentially what the level and strength of that Taser compared to the date of the incident would not be able to be commented on as that would be speculation.

          THE COURT: All right. Okay. Here's—over objection here's what the State's going to be able to do. The State will be able to hand People's Exhibit 2 to Sergeant Hewkin. He can discharge it and explain what he's doing when he does that. After it discharges then he can explain to the jury if there's a difference between how it looks and sounds now as opposed to how it looked and sounded that day, and I will let him give the opinion that it appears that the battery may have worn down a bit. I will let him give the opinion. I think that's a common

- 6 -

sense conclusion. However, he may not take out his Taser and activate his Taser device as some sort of comparison. I'll let you use the actual device that was recovered and have a witness who observed it at the time and activated it at the time explain that there is a difference there.

So, you can do that, but that's all you do.

\* \* \*

Mr. Anderson, there's no need for you to renew your objection when the demonstration takes place. I'll take that as being established for the record and assume that the objection continues unless there's some new basis or something new comes up and then you can—that's fine—object and ask to approach, but just so you know the record's preserved is what I'm saying.

MR. ANDERSON: Understand.

THE COURT: You don't have to object when it happens."

¶ 17　　　　Thus, defense counsel told the circuit court that firing the stun gun would be "fine." His "only" objection would be against Hewkin's comparing the strength of the stun gun now to its strength in the past. That was not the same as saying that firing the stun gun would be fine *provided that* Hewkin refrained from comparing its present strength to its past strength. Defense counsel did not use any language suggesting that his agreement to the firing of the stun gun had any strings attached. Rather, he simply agreed to one thing and objected to another thing. Because a contemporaneous objection is necessary to preserve an evidentiary issue for review (*People v. Enoch*, 122 Ill. 2d 176, 186 (1988)), defendant has forfeited his arguments against the demonstration firing of the stun gun.

- 7 -

¶ 18       In fact, the supreme court has held that "*[b]oth* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases in original.) *Id.* Although, contemporaneously, defense counsel objected to Hewkin's comparing the power of the stun gun now to its power in the past, the posttrial motion did not reiterate that objection. Rather, all the posttrial motion had to say about the stun gun was this:

> "4. The Court erred in granting, over objection, the People's request to have Sergeant Hewkin activate the taser in front of the jury. The objection should have been sustained."

This was not a claim that the circuit court had erred by allowing Hewkin to verbally compare the present strength of the stun gun to its past strength. That claim, therefore, likewise is forfeited. See *id.*

¶ 19                           B. The Cell Phone Video

¶ 20       In the cell phone video, a person in Wease's van, which was parked behind Wodetzki's gray car, says, "I hadn't even finished ordering. Are you kidding me? Tasers are illegal in Illinois, too." Someone in the van also can be heard saying, "She ain't f*** around, though. You need to call the cops." In response to defendant's motion *in limine*, the State cut those two statements out of the video except for the concluding words of the first statement: "Illinois, too." The reason why the words "Illinois, too" were left in the edited video was that those words overlapped the sound of the stun gun being discharged.

¶ 21       The two deletions caused skips in the video. A viewer of the video would be able to tell that material had been edited out. For that reason, defense counsel objected to the edited video:

- 8 -

"MR. ANDERSON: Your Honor, same objection as I had yesterday.

Essentially the way it is would draw unfair prejudice to the Defendant in that they'd be wondering what happened in between and would unfairly draw that conclusion that it was something against the Defendant happened during that period of time. They don't know what it is, but they would assume and, your Honor, it could be worse than what's actually shown in that period of time. And now that we've even added more time to this cut it's not as it was yesterday which I believe you stated that there wasn't much of a jump. Here it's a pretty jump. You almost catch somebody—a cut of a sentence and then right into another and this alleged Taser fire.

For that reason I'd be objecting. Also, I'd be objecting as to the foundation. It's a new video. Foundation would have to be laid."

¶ 22 Thus, defense counsel objected to the edited video on two grounds. The first ground of objection was that the jury would speculate, from the skips, that information prejudicial to the defense had been edited out. The second ground of objection (which defendant does not raise on appeal) was that the State had laid no foundation for the admission of the edited video. Any ground of objection other than the ground of speculation has been forfeited. See *People v. Barrios*, 114 Ill. 2d 265, 275 (1986) (holding that "[o]bjections at trial on specific grounds *** waive," that is to say, forfeit, "all other grounds of objection").

¶ 23 The circuit court rejected the foundational objection because the unedited video, People's exhibit No. 1, already had been admitted in evidence. The question now, the court explained, was what parts of People's exhibit No. 1 should be published to the jury. The court reasoned:

"The State's made an attempt that seems to me to be a reasonable one to cut what is unfairly prejudicial and inadmissible out and leave just what can be shown in the video that is relevant as it captures the end part of this incident that happened. Although, I understand your argument that really the incident is over. I've already addressed that. I don't think that's right, and then the activation of the device right at the end. To get that a little bit of the audio had to stay there, [']Illinois, too.['] I don't think that conveys the unfair prejudice that the full statement does. I think the prejudicial part's been excised.

Now, I do agree that it causes some jumps. There are two jumps in the video. However, the testimony already has been that this only captured the end and the testimony's established that she never got out of the car again once she got back in and the two pieces that are—where there's a jump are just her and the car and there's absolutely nothing that would indicate that there's any hidden action that the jury can infer that she did in this skipped piece to hold it against her. I—I don't think that's what—I don't think that's a reasonable inference the jury would draw, so I agree with you. It's not perfect, but what's being done is a reasonable—the creation of a reasonable version of People's Exhibit 1 to publish taking out what would have been inadmissible and unfairly prejudicial.

So, the objection's overruled. People's Exhibit 1 can be published to the jury in the form of Exhibit lA."

¶ 24    In other words, according to the testimony, defendant got out of her SUV once, walked over to the gray car behind her SUV, menaced the driver of the gray car with her stun gun, and then returned to her SUV and got back in. The skips in the edited video could not have

- 10 -

reasonably justified the jury in inferring that defendant had performed any further actions other than the actions the testimony had described. Even with the skips, the video shows defendant just standing between the rear of her SUV and the front of the gray car. The court ruled that although the edited video was imperfect, it was reasonable and admissible.

¶ 25 We are unconvinced that this ruling was an abuse of discretion. See *People v. Morgan*, 197 Ill. 2d 404, 455 (2001). Even if the jury assumed that the deleted material was unfavorable to the defense, it is unclear how the skips in the video would have been significantly different from a hearsay objection that the circuit court sustained during the State's case. Suppose that, in a jury trial in a robbery case, the prosecutor asks a witness, "What did the store clerk say to a customer after the defendant rushed out of the store?" Defense counsel makes a hearsay objection, which the circuit court sustains. It would be only natural to assume that the answer the witness would have given would have been disadvantageous to the defense—or else defense counsel would not have objected. We are unaware, however, that such an assumption automatically necessitates a reversal of the judgment.

¶ 26 Typically, circuit courts instruct juries in criminal cases, "From time to time it has been the duty of the court to rule on the admissibility of evidence. You should not concern yourselves with the reasons for these rulings. You should disregard questions [and exhibits] which were withdrawn or to which objections were sustained." Illinois Pattern Jury Instructions, Criminal, No. 1.01 (approved July 18, 2014). Defense counsel in the present case could have tendered a modified version of this cautionary jury instruction. See *People v. Theis*, 2011 IL App (2d) 091080, ¶ 38 (holding that failure to tender instruction results in forfeiture). If defendant really was concerned about the possibility of speculation, he could have tendered an instruction warning the jury not to speculate about the deletions in the video.

¶ 27                              III. CONCLUSION

¶ 28        For the foregoing reasons, we affirm the circuit court's judgment.

¶ 29        Affirmed.